**In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.**

No. 85–01307–R.

United States District Court, E.D. Virginia, Richmond Division.

Aug. 9, 1988.

---

**5.** *Commodity Futures Trading Commission v.*    *Schor* was decided July 7, 1986.

Mark Budnitz, Securities & Exchange Commission, Atlanta, Ga.

Theodore I. Brenner, Stephen W. Bricker, Brenner, Baber & Janus, Richmond, Va.

Francis E. McGovern, Birmingham, Ala.

Michael A. Cooper, Sullivan & Cromwell, New York City.

Clifford Shoemaker, Vienna, Va.

H. Sean Mathis Jesup & Lamont Capital Corp., New York City.

Joseph S. Friedberg, Minneapolis, Minn.

Richard M. Wexwell, Fairfax, Va., Bradley Post, Douglas Bragg, Robert Manchahster, Neal Rossman, Judith Rentschler, for Certain MDL 211 Claimants.

Robert Miller, James Nolan, Bishop, Liberman & Cook, New York City, for Share Holders Committee.

Robert M. Miller, James M. Nolan, David A. Strumwasser, Bishop, Liberman & Cook, New York City, Ross C. Reeves, Willcox & Savage, P.C., Norfolk, Va., for Official Committee of Equity Sec. Holders.

Stanley K. Joynes, III, Rilee, Cantor, Arkema & Edmonds, Richmond, Va., for Legal Representative of Future Tort Claimants.

W. Scott Street, William H. Schwarzschild, III, (Tracie) Lynn F. Jacob, Williams, Mullen & Christian, Richmond, Va., Jan Z. Krasnoweicki, (Yaun Z. Kras-No–Wee–A–Ski) and John G. Harkins, Jr.,

Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Aetna Cas. and Sur. Co.

Peter A. Ivanick, LeBogue, Lamb, Leiby & MacRae, New York City, Steven J. McCardell, LeBogue, Lamb, Leiby & MacRae, Salt Lake City, Utah, for The Examiner (Ralph Maybey).

Paul M. Vincent, Lindsay G. Robertson, Ober, Kaler, Grimes & Shriver, Washington, D.C., for Longbranch Research Associates.

Thomas F. Eubank, Spinella, Owings & Shaia, Richmond, Va., J. Thomas Lenhart, L. Duane Cheek, Philip J. Harvey, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for McGladrey, Hendrickson & Pullen.

James C. Roberts, William R. Cogar, Barbara T. Derry, James S. Crockett, Jr., Bradfute W. Davenport, III, Fred W. Palmore, III, Clifford W. Perrin, Jr., C. Cotesworth Pinckney, Linda J. Thomason, Mays & Valentine, Richmond, Va., Harvey Johnson, Dennis J. Drebsky, Michael L. Cook, William F. Gray, Jr., Carolyn Hewitt, Peter Clapp, Sally M. Henry, Skadden, Arps, Slate, Meagher & Flom, New York City, Penn Ayers Butler, Murphy Weir & Butler, San Francisco, Cal., for A.H. Robins.

John Waites, U.S. Trustee, Alexandria, Va., Norman E. Oliver, Asst. U.S. Trustee, Linda W. Coppinger, Norfolk, Va.

S. David Schiller, Asst. U.S. Atty., Robert W. Jaspen, Henry E. Hudson, Stuart Fischbein, Richmond, Va., for U.S.

Harold S. Novikoff, Leonard M. Rosen, Lawrence P. King, Amy R. Wolf, Wachtell, Lipton, Rosen & Katz, New York City, M. Caldwell Butler, James F. Douthat, John Jessey, Woods, Rogers & Hazlegrove, Roanoke, Va., for Official Unsecured Creditors Committee.

Murray Drabkin, Mark Ellenberg, James Wallack, Peter M. Dodson, Imogene Lehman, Cadwalader, Wickersham & Taft, Washington, D.C., Lawrence B. Cann, III, George B. Little, Little, Parsley & Cluverius, Richmond, Va., for Committee of Representatives of Dalkon Shield Claimants.

MEMORANDUM

MERHIGE, District Judge.

The matter before the Court addresses the issue as to the propriety of allowing a claim for punitive damages to women who were allegedly injured by the Dalkon Shield intrauterine device ("Dalkon Shield," "IUD") within the context of this Chapter 11 bankruptcy proceeding. Although the issue may, by virtue of the approved plan of reorganization, be moot, the Court, in the interest of a full record, states herein as additional support for its conclusion that punitive damages are inappropriate in the context of this cause for the following reasons:

## I. *Background*

A.H. Robins Company, Incorporated ("Robins," "the Company," "the Debtor," "Debtor-in-Possession"), a Richmond based corporation that engages in, *inter alia*, the research, development, manufacture, and marketing of pharmaceuticals and consumer products, acquired the exclusive rights to the Dalkon Shield intrauterine device ("Dalkon Shield," "IUD") from the Dalkon Corporation on June 12, 1970. From that date forward Robins was the sole manufacturer, producer and distributor of the Dalkon Shield in the United States and abroad. Statistics reflect that, from the time Robins acquired the rights to the Shield in June of 1970 until it was removed from the market in June of 1974, approximately 2.2 million were sold. These sales generated gross revenues for the Company in the amount of $11,240,611 and gross profits in the amount of $505,499.

Although the Dalkon Shield was invented and marketed as the newest and safest method of birth control for women, its use resulted in both slight and serious injuries to many of its users as well as inflicting compensable injury to certain individuals related in some degree to a user. In short, what was initially viewed as a safe product became, in some instances, a product of debilitation to many innocent victims. Women who had worn the shield suffered from injuries as slight as discomfort to as serious as pelvic inflammatory disease, ec-topic pregnancy, septic abortion and worse. Commencing in 1971, injured parties began to file claims against the Company for both compensatory and punitive damages. By the time Robins filed its petition for relief under Chapter 11 of Title 11 of the United States Code, the Company had settled 9,238 claims for approximately $530,000,000. Despite these settlements, Robins, at the time it filed for relief, still faced over five thousand pending cases in state and federal court.

While the litigation against the Company was slow to start, by 1985 an average in excess of seventy (70) cases per week were being filed. These claims against the Company usually sought both compensatory and punitive relief. While the Company was able, to a certain extent, to assess monetarily its compensatory liability, it was unable to estimate the punitive aspect of the claims.

In 1981, in an effort to gain some control over the punitive damages awards, the Company supported certification of a nationwide class action in the United States District Court for the Northern District of California. *See In re Northern District of California Dalkon Shield "IUD" Products Liability Litigation*, 526 F.Supp. 887 (N.D.Cal.1981) [hereinafter referred to as *"Dalkon Shield"*]. The District Court, Judge Spencer Williams presiding, granted class certification on the ground that there was a limited fund available to these claimants: claims against the manufacturer exceeded $3 billion and manufacturers assets were presumed to be much less. *See Dalkon Shield*, 526 F.Supp. at 897. On appeal, the United States Court of Appeals for the Ninth Circuit vacated Judge Williams' certification, holding that it was erroneous to certify a nationwide class of punitive damages claimants because, amongst other reasons, no effort had been made to make a preliminary fact finding inquiry concerning actual assets, insurance settlement experience and exposure. *See Dalkon Shield*, 693 F.2d 847 (9th Cir.1982), *cert. denied sub nom.*, *A.H. Robins Co. v. Abed*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Nor was any evidence adduced as to the likelihood of Robins being capable or incapable of responding to punitive dam-

ages. *Id.* Additionally, the court concluded that the requirement that a class action be superior to other means of adjudication had not been satisfied. *Id.*

Having failed to certify a class for punitive damages purposes, Robins was forced to deal with those claims on a case by case basis. Prior to its filing for Chapter 11 relief, approximately $13,227,000 in punitive damages were awarded and satisfied as a result of only seven judgments. Notwithstanding these awards, there were over $7,000,000 in punitive damages awarded that were pending appeal when the debtor filed for relief. Robins also had settled, prior to its filing for relief, two awards of punitive damages, in the total amount of $3,438,210.17.

The Company's punitive damage exposure was staggering. Moreover, it was unpredictable. By the time the Company filed its petition, punitive awards had run from as little as $5.00 in *Carley v. A.H. Robins Company* to as much as $7,500,-000.00 in *Tetuan v. A.H. Robins Company.* The *Tetuan* award, which was at the time of filing on appeal, had been collateralized prior to Robins filing under Chapter 11 and was, upon affirmance, satisfied.

The Company's liability arising out of these Dalkon Shield claims caused a critical depletion of the Company's operating funds. By June of 1985, the Company's unrestricted funds were estimated to be $5 million. Robins' financial picture had become so bleak that financial institutions were unwilling to lend it money. With only $5 million in unrestricted funds and the inability to secure commercial financing, it appears that Robins had no choice but to file for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.,* (the "Code").

## II. *Merits*

### 1. *Parties' Positions.*

When this issue first arose, the parties disagreed over whether punitive damages should be allowed in this Chapter 11. The Dalkon Shield Claimants Committee ("Claimants Committee") argued that claimants should be able to recover punitive damages from Robins based on the Company's history of egregious conduct. The Committee for Future Tort Claimants ("Futures") argued that, while punitives are allowable, they should, nevertheless, be subordinated to all other general unsecured claims. While these parties have since joined in supporting a consensual plan of reorganization, the Court views their former positions as representative of the relatively few dissenting claimants.

The remaining parties in interest, the Official Committee of Unsecured Creditors ("Unsecured Creditors"), the Official Committee of Equity Security Holders ("Equity Committee") and Robins all argue for the disallowance of punitive damages. The Unsecured Creditors present three alternative positions. First, they argue that Section 502(b)(1) of the Code proscribes the award of punitive damages because such an award would be contrary to the laws of some states. Second, the Unsecured Creditors argue that the Court has the power to disallow punitive damages under the Court's general equity powers, and, since such an award would preclude a successful reorganization of the Company, they should be disallowed. Finally, the Unsecured Creditors argue that if punitive damages are not disallowed, they should, at a minimum, be subordinated to all other general unsecured claims pursuant to Section 510(c) of the Code.

Robins and the Equity Committee argue similar positions. Their view is that prior to Robins' filing for Chapter 11, the Company had satisfied over $13,225,000 in punitive damages awards.[1] Such a substantial expenditure of money, they argue, served any and all remedial purposes which could justify an award of punitive damages.

---

1. The record reflects that an additional $7,500,-000 punitive damages judgment was satisfied in a case which was on appeal at the time of the filing of the Bankruptcy Petition. This Court lifted the automatic stay as to that case which was affirmed by the U.S. Court of Appeals for the Eighth Circuit. Additionally, there are still two unsatisfied punitive award judgments in the amounts of $100,000.00 and $5.00 respectively.

They also argue that any further punitive damages award would preclude a successful reorganization of the Company, and accordingly should be disallowed by the Court under the general equity powers of the Code.

While the Court acknowledges counsels' views regarding the plight of a Company that is exposed to multiple punitive damage verdicts based on the manufacture of one unfortunate product, the Court deems it inappropriate to base its ultimate decision to disallow punitive damages on that rationale alone. Instead, the Court will invoke its equitable power to disallow punitive damages other than the sums allocated "in lieu of punitive damages" as called for in the Debtor's Sixth Amended and Restated Plan of Reorganization.[2] Coupled with this invocation of its equitable powers is the Court's conclusion that there is a firm statutory basis for precluding claims for punitive damages. It is this Court's conclusion that if the Company is to be given an opportunity to reorganize, it cannot be liable for any claim for punitive damages in the traditional sense.

### 2. *11 U.S.C. §§ 502 and 1129(a)(7)*

Section 502 provides the statutory framework for the allowance of claims in a Chapter 11 proceeding. Pursuant to Section 502(a), all claims are deemed "allowed" unless objected to by a party in interest. There are, of course, exceptions to this general rule of allowability, and these exceptions are found in Section 502(b). In pertinent part, Section 502(b) provides:

> Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law

for a reason other than because such claim is contingent or unmatured.

The Unsecured Creditors argue that Section 502(b)(1) works to disallow punitive damages in this case. The Unsecured Creditors argue that "any further award of punitive damages with respect to the Dalkon Shield would be contrary to applicable law and hence subject to disallowance, inasmuch as no legitimate purpose can any longer be served by the award of punitive damages." *See Brief of Unsecured Creditors Committee*, p. 2.

While the Unsecured Creditors' argument seems plausible on the surface, the Court finds that its position is premised on assumptions which are not properly assumable. The Unsecured Creditors assume that an award for punitive damages has only two purposes: (1) to punish the defendant, and (2) to deter future wrongdoing. Once identifying the two purposes for awarding punitive damages, the Unsecured Creditors argue that these purposes have been served and any further award would only be multitudinous punishment. It is the Unsecured Creditors' position that since the Company had already expended more money in satisfaction of punitive damages awards than it had received from gross receipts of the sale of the Dalkon Shield, and because these staggering awards had driven the company into bankruptcy, the Company had been punished enough. Additionally, they reason that any further award of punitive damages could not deter the Company from any future wrongful conduct, contending that the substantial awards have already served that purpose.

While the premise of the Unsecured Creditors' position follows the majority view for awarding punitive damages, there are still a minority of states that ascribe to a different philosophy. For example, some states award punitive damages for compensatory purposes. Others award punitive damages for the recovery of attorneys fees. While these differences might, at

---

**2.** Under the Debtor's Sixth Amended and Restated Plan of Reorganization, any funds remaining in the claimants' trust after the com-

pensatory damage claims are satisfied will be distributed proportionally to the claimants in lieu of punitive damages.

first blush, seem insignificant, they are important in this case due to the state law derivation of each of the bodily injury claims. Thus, while the Unsecured Creditor's application of Section 502(b)(1) might justify the disallowance of punitive damages in some states, it certainly would not justify disallowance in all states. Moreover, the Unsecured Creditors' position on punitive damage awards is a highly controversial position, and one that has not, to date, been endorsed and upheld by any jurisdiction as a reason for disallowing, or precluding, multiple punitive damages awards against a defendant for the manufacture of one defective product. Numerous law review articles have been written on whether the Eighth Amendment's prohibition against cruel and unusual punishment is violated by successive awards for punitive damages. However, albeit these purely academic discussions, there has been no resolve of the issue. *See Bankers Life and Casualty Co. v. Crenshaw,* — U.S. ——, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).

Accordingly, a request by the Unsecured Creditors that this Court disallow an award of punitive damages because it would be contrary to state law would be an invitation to commit judicial error. The Court will decline the invitation.

■ Conversely, the Dalkon Shield Claimants Committee argues that the Bankruptcy Code dictates punitive damages be awarded. The Claimants Committee bases its contention on its view that Section 1129(a)(7)(A)(ii) mandates this conclusion. The Court is of the opinion that such a conclusion is in error.

The pertinent section reads as follows:

With respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class— ... (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or re-

tain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A).

The Court is satisfied that the above quoted section simply provides an assurance that funds made available in a Chapter 11 estate is at least as much as would be made available in the liquidation of a Chapter 7 estate. It was not enacted for the purpose of determining the availability of punitive damages.

The Claimants Committee, however, contends that Section 1129(a)(7)(A) stands for the proposition that a holder of a claim rejecting a plan must receive as much as the holder would receive if the debtor were liquidated under Chapter 7. They point out that Section 726(a)(4) provides for a fourth priority payment of an allowed claim for punitive damages in a Chapter 7 liquidation.

What the Claimants Committee overlooks or ignores is that Section 726 is not applicable to a Chapter 11 case. Section 103 dealing with the "applicability of chapters" specifically states that: "(b) Subchapters I and II of Chapter 7 of this title apply *only* in a case under such chapter" (emphasis added). Subchapter II, which encompasses Section 726, is simply not applicable to the instant case.

Admittedly there are specific references in Chapter 11 regarding the applicability of particular sections of Chapter 7 to Chapter 11 and, of course, those sections would be applicable to the instant case. *See* 11 U.S.C. §§ 1106(a)(1) and 1141(d)(3)(C), ("Duties of Trustee and Examiner," and "Effect of Confirmation" respectively).

Nevertheless, except for the oblique reference in Section 1129(a)(7)(A)(ii) to Chapter 7 quoted above, the Code is silent as to any reference to applicability of Section 726 to Chapter 11 and, consequently, the unambiguous provision of Section 103 would apply. *In re Matter of Colin,* 44 B.R. 806 (Bankr.S.D.N.Y.1984). For these reasons, the Court concludes that the Claimants Committee's contention that the Bankruptcy Code mandates a payment of punitive damages in a plan of reorganization under Chapter 11 is unsupported in law.

### 3. *Equity.*

■ While Section 502 provides the statutory framework for the allowance of a claim, its provisions do not circumscribe the general equity powers of a court exercising bankruptcy jurisdiction. In the past, bankruptcy courts have resorted to their equitable powers to determine whether a claim will be allowable. This practice, while developed within the framework of the Bankruptcy Act, is deeply entrenched in judicial precedent and is relied on by courts today in the interpretation of the provisions of the Bankruptcy Code.

In *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the United States Supreme Court was faced with the determination of whether a valid state court judgment could be disallowed in a bankruptcy proceeding. The Court held that in passing on an allowance of claims, the court sits as a court of equity. Consequently, the court has far reaching powers to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper v. Litton,* 308 U.S. at 308, 60 S.Ct. at 246.

The principles of *Pepper v. Litton* were later relied on by the Court in *Heiser v. Woodruff,* 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1945). In *Heiser,* the Court once again was faced with a valid state court judgment which was being challenged within the bankruptcy. The Court held that:

> In passing upon and rejecting or allowing the proof of claim in this case, the court of bankruptcy proceeds—not without appropriate regard for rights acquired under state law—under federal statutes which govern the proof and allowance of claims based on judgments. In determining what judgments are provable and what objections may be made to their proof, and in determining the extent to which the inequitable conduct of a claimant in acquiring or asserting his claim in bankruptcy, requires its rejection or its subordination to other claims which, in other respects, are of the same class, the

bankruptcy court is defining and applying federal, not state, law.

*Heiser,* 327 U.S. at 732, 66 S.Ct. at 856.

The different principles underlying the determination of a valid state court judgment and the determination of the allowability of a claim in bankruptcy was further explained by the Court in *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). In *Vanston,* the Court was presented with the issue of whether a claim for interest on interest would be allowable in a reorganization under Chapter X of the Bankruptcy Act. Without deciding whether the interest would have been recoverable in state court, the Supreme Court held the claim in bankruptcy properly disallowable. The Court explained as follows:

> [B]ankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims should be allowed under equitable principles. And we think an allowance of interest on interest under the circumstances shown by this case would not be in accord with the equitable principles governing bankruptcy distributions.

*Vanston,* 329 U.S. at 162–63, 67 S.Ct. at 240. In his concurring opinion in *Vanston,* Justice Frankfurter clarified the courts' power to disallow a claim in stating that:

> [I]n the proper adjustment of the rights of creditors and the desire to rehabilitate the debtor, Congress under its bankruptcy power may authorize its courts to refuse to allow existing debts to be proven. It may do so, for instance, where the recognition of such claims would undermine the fair administration of a debtor's estate.

*Vanston,* 329 U.S. at 169–70, 67 S.Ct. at 243 (Frankfurter, J., concurring).

While the Court acknowledges that these opinions were written in the earlier part of the 1900's when the Bankruptcy Act was the controlling rule of law, the underlying principles of these cases are equally applicable to the present governing law, the Bankruptcy Code. The extraordinary abili-

ty of a court to invoke equity as not only a source of remedial relief, but also as a source of judicial power, is as prevalent under the Code as it was under the Act. *See* 11 U.S.C. § 105(a). Accordingly, this Court finds the equitable principles and powers expressed in *Pepper, Heiser,* and *Vanston* to be as applicable to problems arising under the Code, as those which arose under the Act.

Equity provides this Court the power to disallow punitive damages if the Court determines that such an allowance would frustrate the successful reorganization of the Company. It is this Court's finding that punitive damages must be disallowed if Robins ·is to be given the opportunity provided under Chapter 11 to successfully reorganize and function as a viable entity.

In this case, as in any case, punitive damages cannot be estimated. As Robins stated in its Brief, the award of punitive damages has a wild card characteristic— within six weeks, two separate juries returned punitive damages verdicts against the Company in the divergent amounts of $7.5 million in *Tetuan v. A. H. Robins Company* [May 3, 1985] and $5.00 in the case styled *Carley v. A. H. Robins Company* [June 12, 1985]. This unknown liability would destroy the ability of Robins to reorganize because the impossibility of estimating a liability of the Company renders compliance with numerous provisions of the Bankruptcy Code virtually impossible.

For example, unless confirmation of the plan were to await the liquidation of each and every Dalkon Shield claim, it was necessary for the Court, as it did, to estimate those compensatory claims so that sufficient funds could be allocated in any plan to fully and fairly compensate those to whom the Debtor was legally liable. Indeed, the circumstances of this case were such that a realistic effort to effectuate a sale or a merger at the highest price was extremely doubtful unless and until a prospective principal could be reasonably assured that it could participate in any reorganization with both the knowledge of and its capability of fulfilling its ultimate financial responsibility. The presence of a "wild card" in the form of punitive damages would constitute the death knell of any feasible reorganization plan. *See* 11 U.S.C. § 502(c). In addition, in order for a Chapter 11 plan to be confirmed, the Court must make a determination as to its feasibility, *i.e.,* that confirmation is not likely to be followed by liquidation or the need for further financial reorganization. *See* 11 U.S.C. § 1129(a)(11). Once again, the inability to quantify the potential amount of Robins' liabilities for punitive damages claims would make it virtually impossible for this Court to have determined whether Robins would be capable of meeting its obligations under the plan. It would be similarly difficult for the Court to determine whether the "best interest of the creditors" test of Section 1129(a)(7) had been met or, in the event any class had rejected the plan, whether the elements of cramdown under Section 1129(b)(2)(B) could have been satisfied. Given the unquantifiable nature of punitive damage claims, it is also unlikely that a disclosure statement which meets the "adequate information" standard of Section 1125 could have been provided to creditors in order to enable them to vote the now approved plan.

In further support of this Court's ruling to disallow punitive damages is Judge Lifland's opinion in *In re Johns–Manvillle Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988). Johns–Manville Corporation filed a petition for Chapter 11 reorganization in the Southern District of New York after its manufacture and production of asbestos, a product causing injury to a multitude of individuals who were exposed to it. The *Johns–Manville* case has addressed many of the same, difficult issues which have been before this Court.

The allowability of punitive damages was addressed by Judge Lifland in the *Johns–Manville* case. While assessing the feasibility of the proposed plan under 11 U.S.C. § 1129, Judge Lifland faced several objections to the plan based on its disallowance of punitive damages. There, the Court found that the "recovery of punitive damages, of course, would be to risk the

depletion of Trust assets" to the benefit of some claimants but at the expense of other claimants. 68 B.R. at 627. Such a result, the court held, "is inequitable on its face." *Id.* The court explained as follows:

> The purpose of punitive damages, furthermore, is to punish tortfeasors and deter them from their wrongful conduct. Neither purpose would be served by permitting the recovery of punitive damages in this reorganization. Punitive damages under the Plan would be recovered from the Trust. The Trust is not, by any stretch of the imagination, a target to be deterred from wrongful conduct. As noted above, recovery of punitive damages will deplete the Trust at the expense of future victims. These future victims are not merely innocent parties, but rather injured parties who are inexorably backing into the present as their dreaded asbestos diseases manifest themselves. Punitive damages in this context would visit a hardship on this group for wrongs attributable to others. Therefore the policy to be advanced by permitting such damages would not be furthered in this reorganization.

*Id.* (citations omitted). Accordingly, the Court enjoined the recovery of punitive damages pursuant to its equitable power.

The concerns of the *Johns–Manville* court in disallowing punitive damages are equally applicable to this case.

While it has been argued that, instead of disallowing the claims entirely, the Court should subordinate all punitive damages claims pursuant to Section 510(c), this Court refuses to follow that option. While subordination may, in some cases, work as a solution to an otherwise inequitable distribution of assets, it would not serve any such purpose in the instant case.

In *Johns–Manville*, the court refused to subordinate punitive damage claims as an alternative solution to complete disallowance. 68 B.R. at 627. While recognizing its statutory authority to subordinate some claims to others, the court concluded that it would be improper to do so in that proceeding. The court reasoned that "whether or not punitive damages are recoverable in bankruptcy, it is well within the authority of this court to disallow a claim for punitive damages, in the circumstances of this case, where allowing such a claim would ill serve the policy of such awards." *Id.* at 627–28.

Like *Johns–Manville*, this Court would not be furthering any purpose of an award of punitive damages if it were to subordinate such a claim. Moreover, the problems this Court would face if it were to allow an award of punitive damages, would not be resolved through a subordination. It is the Court's view that subordination would merely postpone what would otherwise be an unfair treatment of claimants. Instead, the plan provides that any remaining funds in the initial trust, after the payment of all eligible compensatory damage claims, will be distributed proportionally in lieu of punitive damages.

### III. *Conclusion*

Once a thriving, vibrant, and vital corporation, Robins has now, because of its production of the Shield, relegated its Fortune 500 position on Wall Street to debtor-in-possession in a Chapter 11 reorganization in federal court in Richmond, Virginia. The Debtor having now chosen Chapter 11 as a method by which it can satisfy all its debts and thus "start afresh," the Court will not, by sanctioning windfall damages, thwart this realistic goal to reorganize. Disallowance of punitive damages protects those women who have suffered from the Dalkon Shield; absent the looming spectre of punitives, a trust has been established which will, if managed and maintained as contemplated by the Court as expressed in its opinion finding that the Plan was feasible, provide them full and fair compensatory relief. If punitives were allowed, compensation to the women who filed the claims and to other creditors of the debtor would be manifestly jeopardized.

This Court would not be fulfilling its duties in the oversight of this bankruptcy if it were to allow a windfall claim to certain creditors that could jeopardize the full compensation of claims to all others. For these reasons the Court finds it imperative to

disallow all punitive damage claims in this bankruptcy.

An appropriate order has issued.