**In re BICOASTAL CORPORATION d/b/a Simuflite, f/k/a the Singer Company, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 25, 1991.

See also 131 B.R. 499, 133 B.R. 252.

Harley E. Riedel, Tampa, Fla., Donald E. Engle, St. Paul, Minn., Robert H. Wheeler, for debtor.

William Goldman, New York City, Cindy LoCicero, Tampa, Fla., for Unsecured Creditor's Committee.

Sara Kistler, Asst. U.S. Trustee.

John Patrick, Jr., Tampa, Fla., for U.S. (URDA).

## ORDER ON ESTIMATION OF CLAIM

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 reorganization case. The matter under consideration is the estimation of Claim No. 3071, filed by the United States of America (Government), originally filed on February 1, 1990. The Proof of Claim was filed with a copy of the First Amended Complaint filed by the Government in the U.S. District Court of Maryland. In its Complaint, the Government sought a money judgment against The Singer Company (Singer), the predecessor-in-interest of Bicoastal Corporation (Debtor), based on the claim that Singer intentionally overcharged the Government on numerous contracts it obtained from the Government. The alleged overcharge on these contracts was originally claimed to be $69 million. This amount was incorporated into and forms part of the Proof of Claim filed by the Government. However, the claim was actually filed in the amount of $77 million. In light of the undisputed fact that the claim of the Government is unliquidated before the claim could be allowed, it must be either liquidated or, if not possible, must be estimated by virtue of § 502(c)(1). This Court deferred ruling on Debtor's Objection to the Claim pending the liquidation or estimation of the claim. This Court rejected the Government's request to liquidate its claim in the District Court in Maryland and ordered that the Claim shall be estimated. This Court has limited the estimation to four contracts identified as Apache, Blackhawk, Chinook and Cobra. The facts relevant to the estimation process as established at the final evidentiary hearing are as follows:

At the time relevant to the matter under consideration, Singer operated a division known as Link–Flight Simulation (Link–Flight). The division was one of the foremost manufacturers of flight simulators used primarily by the airline industry, but also by the Government to train pilots on newly-developed aircraft, in this instance, on helicopters. Between 1980 and April, 1988, Link–Flight was operated as a division of Singer. After Singer went through a leveraged-buy-out (LBO), Singer stock in Link–Flight was acquired by CAE Industries, Ltd. (CAE), a Canadian limited partnership, and CAE is currently the entity in control of Link–Flight.

In early 1984, Link–Flight, in response to an invitation to bid by the Government, submitted four separate proposals for the production of flight simulators and related equipment (Government Exhibit 4). These simulators were for four different helicopters used by the Armed Forces, known as the Apache, Blackhawk, Chinook and Cobra.

After receiving initial proposals in March, 1984 from Link–Flight, the Government began an Intensive In–Plant Cost Analysis (IICA) to determine the appropriate cost for the production of these simulators. Following commencement of this analysis, the four helicopter contracts (IICA contracts) were combined for negotiations.

In light of the fact that Link–Flight had built the prototypes for the Apache, Blackhawk, Chinook and Cobra helicopters, Link–Flight became the sole supplier of these simulators, even though the Apache prototype was yet to be accepted by the Government. For this reason, the Apache contract was a price-incentive contract, while the other three were firm, fixed-price contracts. In such contracts, the contractor is paid only the price of the contract, no matter what amount of costs are incurred in actual performance. In a price-incentive contract, the Government and Link–Flight would share equally in any savings or bear equally any cost of overruns experienced in production of the simulator.

Although there is nothing in this record to show that prior to July 13th there were any formal proposals submitted by Link–Flight to the Government, there is no doubt that between March and July there were several "best estimates" submitted to the Government by Link–Flight.

On July 13, 1984, Link–Flight submitted to the Government an updated combined contract pricing proposal to produce the flight simulators at a total cost of $471 million, broken down as follows:

| | |
|---|---|
| Apache | $170,758,073 |
| Blackhawk | 220,801,931 |
| Chinook | 31,259,818 |
| Cobra | 48,243,006 |
| TOTAL | $471,062,828 |

(Government Exhibit 11). The July 13th proposal was the last formal proposal submitted to the Government prior to the start of formal negotiations which commenced on August 6, 1984.

The proposal was submitted under cover of a Department of Defense Contract Pricing Proposal Form (Form DD–633). The Form DD–633 contains a statement verifying that the proposal reflects the "best estimate" or the actual cost of the project as of that date. The July 13, 1984 proposals were also accompanied by a detailed computer run showing the hours and/or amounts allocated to specific contract functions (Government Exhibit 11).

In addition, the proposal was submitted with a cover letter from Link–Flight (Debtor Exhibit 9). This cover letter refers to "price revisions" which would be submitted by August 6, 1984. Additional scope changes that affected the contract prices took place during negotiations.

Although the Form DD–633 verifies that the proposal reflects the contractor's "best estimate" of the cost of the project, it appears Link–Flight had their own set of "true" numbers reflecting actual cost. A handwritten internal document (Government Exhibit 9) describes the difference between the internal numbers and the proposal as follows:

"Best Estimate—What it really takes

Cost Proposal—pumped up top end that is still justifiable and can be sold to the Government."

The evidence is clear from this document and other in-house documents that all the "best estimates" submitted by Link–Flight include a component referred to by the Government as "negotiation reserve" and described by Link–Flight as "management reserve." Regardless of which label is applied, this reserve was never disclosed to the Government and identified as such. Most importantly, the Government was never made aware of individual line items that made up the reserve during the entire negotiation process.

No document was found by the Government or Link–Flight which could be identified as a July 13, 1984 internal "best esti-

mate" which could be matched against the July 13, 1984 formal proposal. None of the computer runs carried a line item identified either as "management reserve" or "negotiation loss reserve." However, a handwritten sheet dated August 2, 1984, (Debtor Exhibit 9, Tab 3) does provide comparisons of Link–Flight's "best estimates" and the total prices proposed by Link–Flight for the four contracts. This document shows a comparison of total costs for the four contracts of $421 million including profits and a total proposal made by Link–Flight of $451 million, including profit.

Between September 18 and September 20, 1984, Link–Flight prepared an internal estimate of its costs to complete the four IICA contracts (Debtor's Exhibit 9, Tab 6). Properly adjusted, the total cost of the four contracts was $321,296,126 according to Link–Flight's internal estimate. On October 2, 1984, Link–Flight submitted to the Government updated proposals (Debtor's Exhibit 9, Tab 6). These proposals showed Link–Flight's costs to complete the contracts as $333,036,524.

On October 5, 1984, the Government and Link–Flight reached an agreement on the price of the contracts. The total contract price of $373 million included the following amounts for each helicoptor:

| | |
|---|---|
| Apache | $133,038,596 |
| Blackhawk | 165,101,487 |
| Chinook | 30,975,116 |
| Cobra | 44,052,306 |

On November 20, 1984, the Government and Link–Flight entered into formal contracts for the production of the Apache, Blackhawk, Chinook and Cobra helicopters for the agreed-upon total price of $373 million as set forth above.

■ These are the basic salient facts established at the trial based on which this Court is required to estimate the amount of damages, if any, suffered by the Government as a result of the alleged failure to disclose charges included in Link–Flight's "best estimates" furnished to the Government. It is the contention of Link–Flight that the October 5 contract price and the September 18–20 internal "best estimate" are the appropriate documents to be com-

pared and used to measure the damages suffered by the Government. The Government contends that the difference between the July 13th proposal and the August 2nd internal "best estimate" is the proper measure of damages suffered by the Government. Before discussing the liability vel non of Link–Flight, the following should be pointed out:

On February 6, 1991, this Court held a hearing on a Motion for Summary Judgment and ruled, first, that the liability of Link–Flight must be presumed for the purpose of estimating the Government's claim; second, that Link–Flight had an obligation to disclose any contingencies in the proposal submitted to the Government and the failure to disclose contingencies created a rebuttable presumption that the Government was damaged dollar-for-dollar by the undisclosed amount. 124 B.R. 598.

This Court's decision was based upon the decision of the Fourth Circuit in *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327 (4th Cir.1989) involving Singer and its Link–Flight division, the predecessor-in-interest of the Debtor. That ruling came on upon a Motion for Preliminary Injunction and did not directly involve the issue of the proper measure of damages suffered by the Government as the result of non-disclosure of contingencies by Singer when it submitted its "best estimate." The Fourth Circuit left no doubt, however, that the controlling law supports the proposition that the contractor's failure to disclose contingencies creates a rebuttable presumption that the Government suffered damages dollar-for-dollar of the amount of the undisclosed contingency. Since this Court is satisfied that the Fourth Circuit decision was and is still controlling, this Court finds that the amount of the reserve which Link–Flight failed to disclose is the proper measure of the damages suffered by the Government.

■ Since Link–Flight failed to disclose the negotiation/management reserve by identifying specific line items, the components of these "reserves," this Court is satisfied that the presumption of fraud was

not rebutted by Link–Flight and, therefore, under the law of this case Link–Flight is liable to the Government for the damages suffered by the Government. The damages suffered by the Government shall be measured by the precise amount of the undisclosed reserves.

■ The problem with this case is the almost insurmountable difficulty in determining from this record the precise amount of damages suffered by the Government. There is no question that the burden to establish the amount of the claimed damages is on the Government and not on Link–Flight.

It is the Government's position that the July 13th proposal which estimated the total cost for the four contracts must be matched to the August 2nd "best estimate" of Link–Flight, which estimated the cost to perform these contracts with profit at $364,827,421.41, a difference of $56 million. The Government contends that this is the amount of damages suffered. This Court is satisfied that before Link–Flight submitted its July 13, 1984 proposal, it certainly had an internal "best estimate," which accompanied the proposal, but, unfortunately this document is not available. Thus, there is no document in evidence from which this Court is able to fix the precise amount of the negotiation/management reserve. This Court is not persuaded that the Government's attempt to reconstruct the nonexistent July 13th "best estimate" by using the August 2nd document, with other related documents to calculate the reserve, is proper.

Link-Flight's expert witness conceded that a negotiation reserve existed throughout negotiations, and he calculated the reserve to be $13.5 million. Link–Flight contends that this reserve is a proper management reserve which is a commonly-accepted contract item and which the Government was fully aware and that it was no secret that it was included in the proposal submitted by Link–Flight.

■ First, this Court is unwilling to accept the proposition that a management reserve is proper. Second, there is hardly any doubt that this undisclosed reserve tainted, *ab initio*, the entire negotiation process. It deprived the Government of the opportunity to scrutinize each and every component of the undisclosed reserve, i.e., some of the items which clearly would not have been acceptable as proper cost items, such as first class travel. Therefore, the position of Link–Flight that the undisclosed negotiation reserve was proper must be rejected.

In the last analysis, it is clear that without a document stating the precise internal numbers in the "best estimate" supporting Link–Flight's July 13th proposal, this Court is left with no competent evidence to measure the damages except the testimony of Debtor's witness that the reserve was not more than $13.5 million. Therefore this Court has no choice but to estimate the damages suffered by the Government at $13.5 million.

■ One last comment. The Government, in addition to seeking an allowance of its claim, also sought to treble its allowed claim pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* Although Chapter 11 of the Bankruptcy Code makes no provision for the allowance of claims based on a fine, penalty, or punitive damages, these are dealt with under § 726(a)(4) of the Bankruptcy Code. Section 726(a)(4) of the Bankruptcy Code provides in pertinent part that claims for fines, penalties and punitive damages are to be severed into two parts: the portion of the claim which constitutes an actual pecuniary loss and that portion of the claim which constitutes a penalty for wrongdoing. See 4 *Collier on Bankruptcy* ¶ 706.02 (15th ed. 1990). The portion of the claim which is based on a penalty is then subordinated to the portion which is based on actual pecuniary loss. See 11 U.S.C. § 726(a)(1) and (a)(4). It is clear that even though Chapter 11 of the Bankruptcy Code does not specifically provide for the treatment of claims based on a fine, penalty, or punitive damages, the Code traditionally has not favored such claims.

This approach has been justified on the basis that an allowance of a claim based on

penalty punishes innocent parties, i.e., the entire body of creditors, and not the actual wrongdoer who deserves the punishment and the entity which the Statute intended to deter and to punish. *In re A.H. Robins Co.*, 89 B.R. 555 (Bankr.E.D.Va.1988); *In re GAC*, 6 B.R. 981 (S.D.Fla.1980) *aff'd* 681 F.2d 1295 (11th Cir.1982). Thus, any request by the Government to estimate their claim in a trebled amount will be denied.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the damages suffered by the Government in the negotiations of the IICA contracts are determined to be the estimated amount of $13.5 million without prejudice with leave for the parties to liquidate the claims in a non-bankruptcy forum. It is further

ORDERED, ADJUDGED AND DE-CREED that this estimation is solely for the purpose of voting on and distribution under the Debtor's Plan of Reorganization.

DONE AND ORDERED.