HUGHES NETWORK SYSTEMS, INCORPORATED, Plaintiff–Appellant,

v.

INTERDIGITAL COMMUNICATIONS CORPORATION, formerly known as International Mobile Machines Corporation, Defendant–Appellee.

No. 93–1751.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1993.

Decided Feb. 23, 1994.

**ARGUED:** Ronald Stephen Longhofer, Honigman, Miller, Schwartz & Cohn, Detroit, Michigan, for Appellant. Charles Edward Dorkey, III, Haythe & Curley, New York, New York, for Appellee. **ON BRIEF:** Raymond W. Henney, Jose L. Patino, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan; James L. Shea, John T. Prisbe, Venable, Baetjer & Howard, Baltimore, Maryland, for Appellant. Edward F. Houff, Church & Houff, P.A., Baltimore, Maryland, for Appellee.

Before WILKINSON and WILLIAMS, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

The question in this case is whether the claimed loss of a contractual security interest can constitute the kind of irreparable harm necessary to support issuance of a preliminary injunction. Although the close relationship of such a claim to money damages makes obtaining a preliminary injunction difficult, we believe the analysis required by our decision in *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189 (4th Cir.1977), still applies. Because we are insufficiently apprised of the basis for the district court's ruling on the preliminary injunction here, we remand the case for further proceedings.

### I.

Plaintiff Hughes Network Systems signed a contract with Inter–Digital Communications Corporation in 1987 to produce "UltraPhone Systems." The UltraPhone is a wireless, digital telecommunications system allowing individual users in remote areas to communicate with one another. It has a central "network station" and independent "subscriber units" for the individual users. Under the contract, Hughes was responsible for producing subscriber units for InterDigital.

The relationship between the two companies was not a happy one. For reasons which are in dispute, InterDigital took delivery of less than 7,000 of the 54,000 units Hughes had agreed to produce. In an attempt to remedy this problem, Hughes and InterDigital negotiated a new agreement in February 1992. This "Master Agreement" reordered the relationship between the two parties. Among its terms was a "lockbox" provision which stated that:

> If [InterDigital] defaults in the performance of its obligations under this [Master] Agreement or any Related Agreement or if [Hughes] otherwise reasonably deems itself insecure, upon demand by [Hughes], [InterDigital] and [Hughes] will enter into a lockbox agreement ... with a bank acceptable to [Hughes].... As provided in the Lockbox Agreement, [InterDigital] will direct all of its customers to pay all revenues for sales of [certain] products or related services into such Lockbox.

Within a year, Hughes apparently determined that InterDigital had defaulted on its obligations under the Master Agreement and that InterDigital's financial situation warranted concern. Hughes therefore requested

that InterDigital enter the lockbox. As contemplated by Hughes, the lockbox would have required InterDigital to direct all payments by customers purchasing certain telecommunications products and services into an account at a bank to be specified. The bank would then have transferred 30% of the funds in that account to Hughes.

InterDigital refused to enter the lockbox, and in February 1993, Hughes sued to force InterDigital's compliance with the lockbox mechanism and to recover the money owed to it by InterDigital. InterDigital responded to the suit with eight counterclaims alleging, among other things, that Hughes had breached fiduciary duties owed to InterDigital, engaged in unfair competition, and breached its contractual obligations. In April 1993, Hughes sought a preliminary injunction to compel InterDigital's entry into the lockbox.

At the preliminary injunction hearing, Hughes pointed to InterDigital's defaults and to InterDigital's precarious financial situation as justifications for ordering the use of the lockbox. The district court, however, declined to issue the injunction. Ruling from the bench, the judge refused to "intervene in an arm's length negotiated contract and to, in effect, go back and put some teeth into a negotiated provision requiring this lock box where there simply were no teeth put into it when it was negotiated." Hughes now appeals.

## II.

In this circuit, determining whether a preliminary injunction should be granted requires the consideration of four factors. These factors are: 1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is not granted; 2) the likelihood of harm to the defendant if the preliminary injunction is granted; 3) the likelihood that plaintiff will succeed on the merits; and 4) the public interest. *Blackwelder,* 550 F.2d at 195–96. These factors are not, however, all weighted equally. The "balance of hardships" reached by comparing the relevant harms to the plaintiff and defendant is the most important determination, dictating, for example, how strong a likelihood of success

showing the plaintiff must make. *See Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991). Additionally, while the factors articulated in *Blackwelder* guide the district court's judgment on a preliminary injunction motion, the decision to grant or deny relief lies within that court's sound discretion and will not be set aside absent an abuse of discretion. *Id.* at 358.

On appeal, Hughes claims that the district court abused its discretion by failing to issue the preliminary injunction when the balance of hardships tipped strongly in Hughes' favor. To prevail on this argument, however, Hughes must demonstrate that it has suffered the type of harm that may be considered in the *Blackwelder* balance. Because the lockbox remedy involves a payment of money to Hughes, Hughes must overcome the presumption that preliminary injunctions will not issue in cases where the harm suffered may be remedied by money damages at judgment.

### A.

The reluctance to award preliminary injunctions where the harm at issue can be remedied by an award of money damages at judgment arises out of the concerns raised by the preliminary injunction remedy. "[A] preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981). Indeed, granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. "[T]he danger of a mistake" in this setting "is substantial." *American Hosp. Supply Corp. v. Hospital Prods., Ltd.,* 780 F.2d 589, 593 (7th Cir.1986).

Preliminary injunctions create other problems as well. The decision on a preliminary injunction motion is an appealable order. *See* 28 U.S.C. 1292(a)(1). Therefore, preliminary injunctions often lead to repetitive litigation as the claim is litigated and appealed for purposes of the preliminary injunction, and then again for purposes of the final

decision on the merits. This repetitive litigation carries significant costs for all parties.

Because of these concerns, courts have insisted that the harm necessary to justify issuance of a preliminary injunction be irreparable. The Supreme Court has stated:

> "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974) (quoting *Virginia Petroleum Jobbers Assoc. v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir. 1958)).

■ Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable. *See, e.g., Morton v. Beyer*, 822 F.2d 364, 371–72 (3d Cir.1987); *Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir.1986). Monetary relief typically may be granted as easily at judgment as at a preliminary injunction hearing, and a party does not normally suffer irreparable harm simply because it has to win a final judgment on the merits to obtain monetary relief.

### B.

■ Even if a loss can be compensated by money damages at judgment, however, extraordinary circumstances may give rise to the irreparable harm required for a preliminary injunction. For example, the Seventh Circuit has noted that even where a harm could be remedied by money damages at judgment, irreparable harm may still exist where the moving party's business cannot survive absent a preliminary injunction or where "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984);

*see also Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 206 (3d Cir.1990) (holding that "the unsatisfiability of a money judgment can constitute irreparable injury"). These situations are quite narrow, reflecting instances where the harm suffered by the plaintiff from denying the injunction is especially high in comparison to the harm suffered by the defendant from granting it.

Furthermore, the preliminary injunctions issued in such cases are carefully tailored, generally operating simply to preserve the plaintiff's opportunity to receive an award of money damages at judgment. *See Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir.1986) (noting that a "preliminary injunction can be granted when it is necessary to protect the damages remedy"); *Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980) (stating that even where a remedy is "limited to damages, an injunction may issue to protect that remedy"). For example, in *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327 (4th Cir.1989), this court allowed a preliminary injunction which required the defendant "to obtain court review and approval of non-ordinary-course-of-business transactions to prevent [the defendant], without court awareness, from further liquidating or distributing its assets." *Id.* at 1328. The court noted that such an injunction could be appropriate where the principal defendant was " 'insolvent' " and its assets were " 'in danger of dissolution and depletion.' " *Id.* at 1330 (quoting *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 285, 61 S.Ct. 229, 231, 85 L.Ed. 189 (1940)).

Of course, where a party desires to quickly establish an entitlement to relief, a better route to pursue is often that of summary judgment. Litigating the balance of respective harms in the more circuitous preliminary injunction route may distract the parties and postpone any determination of the ultimate merits. In fact, if a plaintiff truly suffers an irreparable harm that plainly results from the activities of the opposing party, the prospects for gaining summary judgment should be at least as favorable as the prospects for obtaining a preliminary injunction.

### III.

#### A.

■ We have noted the difficulties that plaintiff faces in securing a preliminary injunction. We believe, nonetheless, that plaintiff is entitled to an appropriate review on its application. On the record before us, however, it is not possible to determine the rationale that guided the district court's refusal to grant the injunction or whether Hughes had a legitimate claim to preliminary injunctive relief under any theory. To begin with, the record is silent on two of the relevant *Blackwelder* issues, namely whether InterDigital would suffer harm from granting the injunction and how the public interest would be affected by either granting or denying the injunction here.

Furthermore, the finding regarding harm to Hughes is difficult to discern. The district court stated that

the only harm that I can find, and, in fact, the only harm that has been argued by [Hughes] is that if the preliminary injunction is not granted the lock box remedy will be lost.

Well, I can understand that that may be unfortunate for [Hughes]. But to leave it up to a Court to determine whether a preliminary injunction is appropriate in a straightforward contract situation where the parties, for whatever reason, have been unable to determine what would be in their best interests to put into that contract to back up their particular terms, it seems to me to miss the mark completely with regard to what is required in a preliminary injunction situation.

This statement is far from clear. The district court may be implying that loss of the lockbox will do little harm to Hughes and, therefore, that a preliminary injunction is not justified. Alternatively, the statement may be read to mean that the type of harm Hughes suffered simply cannot be considered for purposes of an irreparable harm showing. Other interpretations are possible as well: at oral argument, for instance, Hughes claimed that the "only harm" language in the above quotation meant not only that the district court had found harm to Hughes but also that it had found that InterDigital would not be harmed by the injunction.

#### B.

While we might try to evaluate the relevant *Blackwelder* factors ourselves, we believe the district court is in much the better position to do so. On remand, the district court must determine as a threshold matter whether the harm Hughes will suffer absent the lockbox rises to the level of irreparability. In evaluating the magnitude of harm to Hughes, the district court must consider the close relationship of Hughes' claimed harm to an ordinary claim for money damages. Hughes has argued that a preliminary injunction must issue here because monetary relief at judgment cannot compensate for loss of the lockbox. The company points out that the lockbox establishes a security interest which will protect Hughes' credit priority should InterDigital eventually become insolvent. Hughes maintains that forcing InterDigital to enter the lockbox now is the only way to preserve this security interest and to protect Hughes' contractual entitlements.

This argument is too narrow. Hughes' claim may not be identical to ordinary claims for money damages, but it undeniably bears a close kinship to them. Its suit, at bottom, is one for the recovery of a debt owed by InterDigital. The security interest provided by the lockbox and a straightforward award of damages are paths to the same end: the collection of sums allegedly owing to Hughes. The security interest established by the lockbox merely gives Hughes greater assurance that it will ultimately receive the recovery. Indeed, the lockbox itself apparently contemplates the actual transmittal of money by InterDigital to Hughes in advance of final judgment. As such, Hughes' claim bears the infirmities of a request for payment prior to a determination of the case on the merits.

■ On remand, therefore, Hughes will bear a significant burden. However, we cannot say that the relationship of the lockbox to a claim for monetary relief conclusively forecloses the possibility of a preliminary injunction. The lockbox also helps preserve Hughes' ability to recover money damages

should it ultimately prevail at trial. This aspect of the lockbox bears some similarity to an injunction limiting corporate activities to ensure that a defendant's assets are not so dissipated that a monetary judgment will be frustrated. *See, e.g., Singer,* 889 F.2d at 1327; *Teradyne,* 797 F.2d at 43; *see also American Hosp. Supply,* 780 F.2d at 596 (noting that "a defendant's insolvency is a standard ground for concluding that a plaintiff's harm if the preliminary injunction is denied will not be cured by an award of damages at the end of the trial"). It is conceivable, therefore, that the harm to Hughes threatened by the immediate dissipation of InterDigital's assets would be of such a magnitude as to make the award of injunctive relief justifiable.

If on remand, the district court finds that Hughes is threatened with the kind of harm described above, it must then turn to the other *Blackwelder* factors. Specifically, it must evaluate the effect of injunctive relief on InterDigital's ability to continue dealing with the suppliers and customers necessary to its operation. A predictive judgment must also be made regarding the strength of Hughes' claim to the funds InterDigital allegedly owes it and the legitimacy of InterDigital's various counterclaims. In a case where time is important to the parties, the district court may also weigh the prospects for a prompt final judgment in determining the need for any preliminary relief. Finally, the court should consider the effects of preliminary injunctive relief on any nonparties who may possess a significant interest in the outcome. *See Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir.1982) (en banc) (considering harm to "other interested persons" and "to the public interest" in deciding whether to issue a preliminary injunction); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977) (same).

### IV.

We thus remand the case for further proceedings consistent with this opinion. We recognize the value in not permitting a lawsuit to become bogged down in the *Blackwelder* factors, but neither do we think the inquiry required by that decision is one that can be ignored. For the foregoing reasons, the judgment of the district court is

*VACATED AND REMANDED WITH DIRECTIONS.*