CONTINENTAL SECURITIES
CORP., Appellant,

v.

SHENANDOAH NURSING HOME
PARTNERSHIP, Appellee.

Misc. A. No. 95–M–4(H).

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Sept. 11, 1995.

Augustus Charles Epps, Jr., Christian, Barton, Epps, Brent & Chappell, Richmond, VA, Michael F. Wurst, Joseph J. Wielebinski, Raymond J. Urbanik, Munsch, Hardt, Kopf, Harr & Dinan, P.C., Dallas, TX, for appellant.

William E. Shmidheiser, III, Wharton, Aldhizer & Weaver, Harrisonburg, VA, for appellee.

### MEMORANDUM OPINION

MICHAEL, District Judge.

This matter is before the court on the motion of Continental Securities Corp. (Continental) for a stay pending appeal of an order of the bankruptcy court confirming Shenandoah Nursing Home Partnership's (Shenandoah) Second Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code. For the reasons stated herein, the motion is denied.

### I.

On December 12, 1990, Shenandoah, the debtor in this case, and Continental, the creditor, executed a Deed of Trust Note (Note) in the amount of $2,339,900. The Note bears interest at 11.125% per annum through the date of Final Endorsement and thereafter at the rate of 11% per annum on the unpaid balance until paid. The indebtedness is secured by a Deed of Trust lien on the actual property comprising the nursing home. Shenandoah's obligations under the Note are insured by the Department of Housing and Urban Development. The Note

contains a so-called "lockout" provision that prohibits prepayment of the Note prior to December 1, 2001. However, unlike many similar instruments containing lockout provisions, the Note does not contain a penalty provision enforcing the lockout provision. The bankruptcy court's treatment of this provision forms the crucible of this dispute.

On July 1, 1994, Shenandoah filed a voluntary petition in Bankruptcy Court under Chapter 11 of the Bankruptcy Code. The Second Amended Plan of Reorganization (Plan), confirmed by the Bankruptcy Judge on July 31, 1995, provides that "the allowed secured claim of Continental shall be accelerated and all principal and interest accrued as of the Confirmation Date shall be paid in full ten (10) days after the Confirmation Date." *Second Amended Plan of Reorganization* ¶ 4.2.[1] Thus, the Plan allows Shenandoah to prepay the Note in violation of the terms of the lockout provision. Moreover, the Plan does not provide Continental with damages for Shenandoah's prepayment. Continental moved the bankruptcy court to reconsider the Plan, or alternatively, for a stay pending appeal of the Confirmation Order, arguing that the Plan could not be confirmed as a matter of law. In a written order entered on August 3, 1995, the bankruptcy court denied Continental's motions.

Continental now moves this court for a stay pending appeal of the bankruptcy court's order confirming the Plan. On August 7, 1995, this court issued a temporary stay pending completion of the record below. As that record is now complete, the issue of whether to continue or dissolve the stay is ripe for consideration.[2]

## II.

■ Rule 8005 of the Federal Rules of Bankruptcy Procedure governs the issuance of a stay pending an appeal of a bankruptcy court order. Although the issuance of a stay is left to the court's discretion, the Fourth Circuit requires a party seeking a stay to meet the same criteria movants for a preliminary injunction must meet in seeking their relief. *Long v. Robinson*, 432 F.2d 977 (4th Cir.1970); *City of Alexandria v. Helms*, 719 F.2d 699 (4th Cir.1983); *In re Tolco Properties, Inc.*, 6 B.R. 490 (Bankr.E.D.Va.1980).

■ In the Fourth Circuit, district courts must consider, in "flexible interplay," four factors in determining whether to issue a preliminary injunction: 1) the likelihood of irreparable harm to the plaintiff without the injunction; 2) the likelihood of harm to the defendant with an injunction; 3) the plaintiff's likelihood of success on the merits; and 4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193–96 (4th Cir.1977). The Fourth Circuit recently reiterated the proper framework within which to analyze these four factors:

First, the party requesting preliminary relief must make a "clear showing" that he will suffer irreparable harm if the court denies his request. Second, if the party establishes that he will suffer irreparable harm, "the *next* step then for the court to take is to balance the likelihood of irreparable harm to the plaintiff from the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief." Third, if the balance tips decidedly in favor of the party requesting preliminary relief, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." However, "if the balance does not tip decidedly there must be a strong probability of success on the merits." Fourth, the court must evaluate whether the public interest favors granting preliminary relief.

---

1. "Confirmation Date" is defined by the Plan as "that date on which the order of the Bankruptcy Court confirming the Plan becomes a Final Order." *Id.* at ¶ 2.11. "Final Order", in turn, is defined as "an order of the Bankruptcy Court which shall not have been reversed, stayed, modified or amended and as to which the time for appeal or to seek review or rehearing shall have expired, as a result of which, such order shall become final in accordance with Rule 8002 of the Bankruptcy Rules of Practice and Procedure." *Id.* at ¶ 2.18.

2. The court entertained argument on the issue on September 6, 1995.

*Multi–Channel TV Cable Co. v. Charlottes-ville Quality Cable Operating Co,* 22 F.3d 546, 551 (4th Cir.1994) (quoting *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812–813 (4th Cir.1991)).

This framework is followed below.

### A. Irreparable Injury

■ The Fourth Circuit has established the following principles to guide courts in determining whether prospective harm is irreparable. "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Systems, Inc. v. Interdigital Communications Corp.,* 17 F.3d 691 (4th Cir.1994). In other words, "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* at 694 (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1974)). "Thus, when 'the record indicates that [plaintiff's loss] is a matter of simple mathematical calculation,' a plaintiff fails to establish irreparable injury for preliminary injunction purposes." *Multi–Channel,* 22 F.3d at 551–552 (quoting *Graham v. Triangle Pub.,* 344 F.2d 775, 776 (3d Cir.1965)).

■ There are, however, two caveats to the general rule that money damages are not irreparable. "[E]ven where a harm could be remedied by money damages at judgment, irreparable harm may still exist where the moving party's business cannot survive absent a preliminary injunction[3] or 'where damages may be unobtainable from the de-fendant because he may become insolvent before a final judgment can be entered and collected.' " *Hughes Systems,* 17 F.3d at 694 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir.1984)).

■ Finally, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi–Channel,* 22 F.3d at 552.

■ Continental argues that in the absence of a stay, Shenandoah will prepay the Note,[4] and that the consequences of that action will be "irreversible and devastating." *Appellant's Support Memorandum* at 9. Specifically, Continental contends the damage caused by Shenandoah's prepayment of the Note is "at the very least, the difference between the guaranteed income stream provided for under the Note through the year 2001 and the amount the owners of the Note will be able to receive if the proceeds are reinvested." *Id.*

Thus, a significant component of Continental's alleged injury is monetary loss. As stated above, money damages are generally considered non-irreparable. Moreover, the first of the caveats to this general rule is not at issue—Continental does not argue that it will go out of business absent a stay. However, Continental does raise the second caveat—it expresses a concern that Shenandoah may become unable, or unwilling, to pay its obligations under the Note. Continental argues that the first lien it holds on the nursing home property will become inoperable once Shenandoah prepays the Note, thereby effectively releasing Shenandoah from any further obligations under the Note.

Thus, Continental asserts that the money damages it seeks is "irreparable" because

---

**3.** This exception to the general rule characterizing money damages as non-irreparable was poignantly discussed by Judge Friendly in *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970): "Of course, [Plaintiff] Semmes' past profits would afford a basis for calculating damages for a wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms, the Semmes want to sell automobiles, not to live on the income from a damages award." *Id.* at 1205.

**4.** Indeed, Shenandoah tendered a check to Continental shortly after the confirmation hearing before the bankruptcy court. The check has subsequently been returned to Shenandoah.

there is a possibility that it may never take possession of the money. Stated differently, Continental argues that if the court denies its motion, it will become impossible to return all the parties to the status quo should Continental prevail on appeal.

In response, Shenandoah cites the general rule that money damages are by definition non-irreparable. It believes the court can make Continental whole in the absence of a stay—the status quo can be re-born.

The court agrees. There is simply no evidence that Shenandoah will "become insolvent before a final judgment can be entered and collected" as required under *Hughes'* second caveat. *Hughes,* 17 F.3d 691 at 694. Nor is there any evidence to support Continental's assertion that Shenandoah may become unwilling to pay whatever obligation this court places upon Shenandoah. The record compiled thus far indicates the opposite. Shenandoah moved immediately to pay its obligation under the Plan to Continental. It has stipulated that the issue of damages is preserved on appeal despite consummation of the Plan. In short, this is not one of those "extraordinary circumstances [that] may give rise to the irreparable harm required for . . . preliminary [relief]." *Id.*[5]

In addition to arguing that the status quo is imperiled by the denial of its motion for a stay, Continental also argues that it will suffer irreparable harm as a result of lost goodwill in the absence of a stay. Continental sold "strips" of the guaranteed income stream generated by the Note to third parties who necessarily view the lockout provision as the guarantor of a steady income stream over time. Moreover, some of these third-parties could face significant, yet unforeseen, tax liabilities as a result of the prepayment by Shenandoah. Continental urges that these third-parties will be unlikely again to make similar investments with Continental if the court denies its motion for a stay.

In response, Shenandoah argues that there is no evidence in the record to support Continental's claim of lost goodwill. However, it seems indisputable that Continental will suffer lost goodwill as a result of the prepayment given that part of its business comprises selling strips generated by long-term Notes. It is true that the extent of that lost goodwill is impossible to calculate on this record. However, that factor would appear to cut in favor of a finding of irreparable harm.

In short, Continental has made a colorable showing of irreparable injury should the court deny its motion for a stay pending appeal. Although its potential monetary loss can be remedied, the potential loss of goodwill among third-party beneficiaries of the Note cannot. Thus, the court concludes that Continental has made a showing that it will suffer some degree of irreparable injury in the absence of a stay.

### B. Balancing of Harms

▋ The potential harm suffered by Continental in the form of lost goodwill must next be balanced against the harm to Shenandoah should the court grant the stay. Shenandoah argues that it will be irreparably harmed if the court grants a stay pending appeal because the fragile settlement will "quickly unravel if not quickly consummated." *Appellee's Opposition Memorandum* at 10. Indeed, Shenandoah notes that Continental's attorney remarked that this is "one of the most vicious internecine partnership fights that I've ever been a witness to." *Id.* Shenandoah asserts that new appraisals will need to be conducted and settled issues may need to be re-litigated if the stay is granted.

▋ It is unclear whether or not the settlement will unravel if the court grants the stay. The bankruptcy court did not make such a finding. However, even if the settlement does not quickly unravel, Shenandoah will nevertheless be significantly harmed if the court grants the stay. Shenandoah sought relief in a bankruptcy court because it wished to get its financial affairs in order.

---

5. Continental attempts to re-characterize its potential monetary loss as a loss of the "benefit of its bargain", which it argues is non-monetary and irreparable. This logic could render preliminary relief available for every breach of contract claimant, an outcome that would turn the general rule characterizing contract damages as non-irreparable on its head.

Now having received that relief, it is anxious to reap the benefits of its reorganization. The Bankruptcy Code engenders a vital public policy of providing businesses an opportunity to "start anew." Shenandoah is necessarily harmed by significant delays in its efforts to do just that. Thus, the harm to Shenandoah caused by the issuance of a stay counteracts, to an extent, the irreparable harm to Continental in the form of lost goodwill should the court deny the motion for a stay.

## C. Likelihood of Success on the Merits

### 1. Movant's Burden

 Given that the balance of harms "does not tip decidedly [in favor of Continental,] there must be a strong possibility of success on the merits." [6] *Multi–Channel*, 22 F.3d at 551. Moreover, in *Blackwelder*, the Fourth Circuit explained that the standard under this prong is heightened when the movant seeks relief on appeal, as in this case. The court in *Blackwelder* reversed the district court's denial of a motion for a preliminary injunction on the grounds that the district court employed a heightened standard in assessing the likelihood of the movant's success on the merits. The court concluded that such a standard was appropriate only for cases in an appellate posture. The court explained:

> The cases relied upon by the district court deal with the question of the issuance *vel non* of an *appellate* stay pending review of an administrative order or a trial court decision that dealt with the merits of the controversy. Hence they propound an *appellate* standard—and not one for use in trial courts.
>
> In cases [erroneously relied upon by the district court] a judicial or quasi-judicial body has already passed upon the merits of a question and typically has also denied

a discretionary stay of its decision; only then is the motion made for an appellate stay. For a stay to issue under such circumstances, we adopted in *Airport Comm'n v. Forsyth* [*Airport Commission of Forsyth County v. C.A.B.*], 296 F.2d 95 [4th Cir.1961], the requirement ... that a "strong showing" of probable success on appeal be made, for otherwise there is "no justification for the [appellate] court's intrusion into the ordinary processes of administrative and judicial review."

> Likewise, *Long v. Robinson*, 432 F.2d 977 (4th Cir.1970), another "strong showing" case from this circuit, involved a stay-pending-appeal situation, in which the district court had *fully considered the merits of the controversy*, rendered its final decree, and refused the request for an interim stay. Judge Winter explained in *Long* that the petitioner's burden in seeking injunctive relief is substantially greater on appeal.

*Blackwelder*, 550 F.2d at 193–194 (emphasis in original).

The court noted that "[e]ven the treatise writers have mistakenly equated the stringent standards [on appeal] with the more flexible standards [applicable at the trial level]." *Id.* at 193. Since this court is sitting as an appellate court in this matter, the appellate standard is appropriate.

 Thus, Continental must make a "strong showing" of the likelihood of success on the merits given that the balance of harms inherent in the court's granting the stay does not tip decidedly in Continental's favor, and given that the matter comes before the court in an appellate posture.

### 2. The Merits

Continental argues that the bankruptcy court erred in confirming the Plan because the Plan is not confirmable as a matter of law under § 1129 of the Bankruptcy Code.[7]

---

6. Continental argues that it need make only a "significant" showing of likelihood of success on the merits. *Appellant's Support Memorandum* at 7 (citing *In re Richmond Metal Finishers, Inc.*, 36 B.R. 270 (Bankr.E.D.Va.1984)). The case is of limited value since it does not employ the framework recently articulated in *Multi–Channel*.

7. Section 1129 provides in pertinent part as follows:

**Confirmation of Plan.**
(a) The court shall confirm a plan only if all of the following requirements are met:

Continental makes several arguments in support of its proposition,[8] all of which spring from two principal arguments. First, Continental maintains that the bankruptcy court's characterization of its claim as "unimpaired" is erroneous. Continental argues that under § 1124 of the Bankruptcy Code, it is an "impaired" creditor, and as such, it must vote in favor of the Plan in order for it to be confirmed. 11 U.S.C. § 1129. Since it did not vote in favor of the Plan, Continental argues that the bankruptcy court erred in confirming it. Second, Continental alleges that the Plan violates § 1129(a)(3) because it was not proposed in good faith and because it is violative of federal law. The bankruptcy court rejected both arguments. As discussed below, the bankruptcy court's analysis of the merits is sound. Consequently, Continental is unable to make a strong showing of probable success on the merits.

### (a). "IMPAIRMENT" UNDER § 1124

Section 1124 of the Bankruptcy Code addresses the impairment of claims. It provides as follows:

> [A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> > (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest[; or]
>
> * * * * * *
>
> > (A) With respect to a class of secured claims, the plan provides—
> > (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> > (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
> > (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
> > (iii) for the realization by such holders of the indubitable equivalent of such claims.

> (1) The plan complies with the applicable provisions of this title.
> * * * * * *
> (3) The Plan has been proposed in good faith and not by any means forbidden by law.
> * * * * * *
> (7) With respect to each impaired class of claims or interests—
> (A) each holder of a claim or interest of such class—
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;
> (8) With respect to each class of claims or interests—
> (A) such class has accepted the plan; or
> (B) such class is not impaired under the plan.
> * * * * * *
> (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
> * * * * * *
> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
> (2) For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

8. Specifically, Continental argues that confirmation of the Plan violates the following statutory provisions: section 1129(a)(1) because the Plan improperly classified Continental's claim as unimpaired; § 1129(a)(3) because prepayment of the Note violates federal law; § 1129(a)(7) because Continental, as an impaired creditor, rejected the Plan and did not receive what it would have received had Shenandoah filed its petition under Chapter 7; § 1129(a)(8) because Continental, as an impaired creditor, rejected the Plan; § 1129(a)(10) because no impaired creditor voted in favor of the Plan; § 1129(b)(1) because the Plan discriminates unfairly against Continental; § 1129(b)(2)(A)(I) and (iii) because Continental is not receiving, under the Plan, payments equal to the value of its interest in the nursing home property, nor is it receiving the indubitable equivalent of its claims, in light of the prohibition against prepayment.

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim.

11 U.S.C. § 1124.

As the bankruptcy court noted, since "these possible exclusions are listed with the conjunction 'or,' if only one is satisfied, the class is unimpaired." *Memorandum Opinion* at 8. Nonetheless, the bankruptcy court held that Continental was not impaired within the meaning of either subsection.

### (1). *Section 1124(3)*

█ The bankruptcy court first held that Continental was not impaired within the meaning of subsection (3) because under that subsection "a claim paid in full is not impaired." *Memorandum Opinion* at 9.

Continental argues that the Plan does not pay its claim in full because it does not include the full value of the Note, since Shenandoah is permitted to prepay it, nor does it include a prepayment premium. However, subsection (3) renders a claim impaired only if the *allowed* amount of the claim is not paid in full. Here, the Plan provides for payment in full of the allowed claim. Of course, the allowed claim does not include all of what Continental seeks. Although Continental reads the provision as rendering a claim impaired if the entire amount asked for is not paid in full, the language of the provision does not support such a reading.

█ Continental is really arguing that the amount of its allowed claim is inadequate as a matter of law. Specifically, it argues (1)

that the Bankruptcy Court does not have the authority to order prepayment of the Note;[9] and (2) that even if the court does have that authority, it must order Shenandoah to pay a prepayment penalty. In support of its first position that the amount of the allowed claim is inadequate because it improperly allows prepayment of the Note, Continental cites a number of cases wherein courts have enforced prepayment prohibition provisions by disallowing prepayment. *See, e.g., Trident Center v. Connecticut General Life Ins. Co.,* 847 F.2d 564 (9th Cir.1988); *Mendrala v. Crown Mortgage Co.,* 955 F.2d 1132 (7th Cir.1992). However, as the bankruptcy court stated, "[a] review of all the cases cited by Continental fails to raise one case where there was a prepayment prohibition enforced in a bankruptcy context." *Memorandum Opinion* at 9. Thus, the bankruptcy court held that it had the power to allow prepayment of the Note.

█ This court was unable to find a case that addresses the power of the bankruptcy court to either permit or prohibit the prepayment of a debt in violation of the terms of a debt instrument. Nor do the parties cite such a case.[10] However, it is extremely unlikely that the bankruptcy court is restrained from ordering the prepayment. Briefly stated, "[i]t would violate the purpose behind the Bankruptcy Code to deny a debtor the ability to reorganize because a creditor has contractually forbidden it." *Id.* at 9–10.

Section 502, which is the general provision governing the allowance of claims, is instructive on this point. It provides in pertinent part as follows:

(a) A claim or interest, proof of which is filed under section 501 of this title, is

---

9. Continental conceded at the confirmation hearing before the bankruptcy court that the court had authority to allow Shenandoah to prepay the Note. It limited its argument to whether the bankruptcy court should require Shenandoah to pay a penalty for doing so. *Transcript of Proceedings, July 20, 1995* at 115 (counsel for Continental stating, "I have conceded to this court and I will continue to concede to this court that I believe a Chapter Eleven court has the ability ... to rewrite the parties' contract"). Continental now argues that the bankruptcy court could not sanction Shenandoah's prepayment of the Note.

10. Shenandoah cites *In re Skyler Ridge,* 80 B.R. 500 (Bankr.C.D.Cal.1987), for the proposition that "a provision in a Note which prohibits prepayment during a time specified is not enforceable in a bankruptcy case." *Debtor's Brief on Prepayment Premium* at 4. However, this is a misstatement of the case. The Note at issue in *Skyler Ridge* expressly allowed prepayment of the Note, albeit upon payment of a penalty. Although the court ultimately held that the prepayment penalty provision was void because the amount of the penalty was unreasonable, it did not face the issue of whether it had the authority to permit prepayment of a Note in the absence of language in the Note allowing prepayment.

deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided [elsewhere], if such objection is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

\* \* \* \* \* \*

(2) such claim is for unmatured interest.

11 U.S.C. § 502.

In this case, Shenandoah did not lodge a formal objection to the claim filed by Continental.[11] There was never a dispute over whether Continental's claim would be allowed. Thus, § 502 is not controlling. Indeed, the parties never mention § 502. However, to the extent § 502 would disallow a claim for unmatured interest, it is relevant here since that is essentially what Continental is seeking. Were the bankruptcy court to hold that Shenandoah must pay Continental the full value of the Note through its maturity, it would essentially be allowing the payment of unmatured interest which is prohibited by § 502.

Thus, the bankruptcy court may not have had statutory authority to order full payment of the Note through maturity. However, the question remains whether the bankruptcy court had the authority to dismiss Shenandoah's future obligations under the Note. In other words, Continental argues that the bankruptcy court was required to leave the Note untouched. Again, it cites no authority for its proposition.

 Continental's assertion that the bankruptcy court did not have the authority to permit Shenandoah to prepay the Note appears to ignore the bankruptcy court's substantial equitable powers. Indeed, there would seem to be almost a presumption that the bankruptcy court could order Shenandoah to prepay the Note despite the prepay-

ment prohibition—the court's equitable power to fashion an appropriate reorganization plan almost certainly trumps a contract provision.

 The Supreme Court has stated that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) (internal quotations omitted). "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Id.* at 307–308, 60 S.Ct. at 246. Consequently, bankruptcy courts have broad power to tailor claims to meet the requirements of justice. As the Supreme Court has noted, "Since the power of· disallowance of claims, conferred on the bankruptcy court by § 2 of the [former Bankruptcy] Act embraces the rejection of claims 'in whole or in part, according to the equities of the case,' the court may undoubtedly require limitation of the amount of claims in view of ˙equitable considerations." *Manufacturers Trust Co. v. Becker*, 338 U.S. 304, 310 n. 7, 70 S.Ct. 127, 131 n. 7, 94 L.Ed. 107 (1949) (quoting *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939)).

For example, in *In re A.H. Robins Co., Inc.*, 89 B.R. 555 (E.D.Va.1988), the bankruptcy court, drawing upon the equitable powers discussed in *Pepper v. Litton*, disallowed a punitive damages claim against a bankrupt manufacturer of the Dalkon Shield because allowing the claim, the exact amount of which was unknown, would have "destroy[ed] the ability of Robins to reorganize" *Id.* at 562. In relying upon *Pepper v. Litton*, the court stated that:

[w]hile Section 502 provides the statutory framework for the allowance of a claim, its provisions do not circumscribe the general equity powers of a court exercising bankruptcy jurisdiction. In the past, bankruptcy courts have resorted to their equity

---

11. This failure by Shenandoah to object to Continental's claim probably stems from Continental's initial concession that the Bankruptcy Court had the authority to permit prepayment of the Note.

In other words, both parties probably assumed that the court would value the claim as the principal of the Note plus any accrued but unpaid interest.

powers to determine whether a claim will be allowable. This practice, while developed within the framework of the Bankruptcy Act, is deeply entrenched in judicial precedent and is relied on by courts today in the interpretation of the provisions of the Bankruptcy Code.... The extraordinary ability of a court to invoke equity as not only a source of remedial relief, but also as a source of judicial power, is as prevalent under the Code as it was under the Act.

*Id.* at 561–562.

The court also cited § 105(a) of the Bankruptcy Code for support. That section states that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The court concluded that:

Equity provides this Court the power to disallow punitive damages if the court determines that such an allowance would frustrate the successful reorganization of the Company. It is this Court's finding that punitive damages must be disallowed if Robins is to be given the opportunity provided under Chapter 11 to successfully reorganize and function as a viable entity.

*In re A.H. Robins,* 89 B.R. at 562.

■ Thus, it would appear that the bankruptcy court could order prepayment of the Note if it felt Shenandoah's reorganization would be jeopardized by a requirement that it continue paying Continental under the terms of the Note.[12] The conjunctive nature of § 1124 supports such an interpretation of the powers of the bankruptcy court since a Plan can "alter" a creditor's legal, contractual, and equitable rights and still leave it "unimpaired" by providing for payment in full of the creditor's allowed claim. Indeed, counsel for Continental conceded at the September 6, 1995 hearing before this court that bankruptcy courts have significant power to re-write contracts in pursuit of an equitable resolution of a Chapter 11 petition.

Continental, forced to acknowledge the traditional equitable powers of the bankruptcy court, has failed to make a "strong showing" that the bankruptcy court exceeded its authority in permitting Shenandoah to prepay the Note.[13]

■ Continental next argues that the allowed claim is inadequate as a matter of law because even if the court had the authority to permit prepayment of the Note, it should have included a prepayment premium in Continental's allowed claim.

The bankruptcy court held that the language of § 506(b) of the Bankruptcy Code expressly prohibits the court from awarding damages for the violation of a lockout provision. Section 506(b) provides that oversecured creditors like Continental are entitled only to "interest on [the oversecured] claim, and any reasonable fees, costs, or charges *provided for under the agreement* under which such claim arose." 11 U.S.C. § 506(b) (emphasis supplied). The bankruptcy court held that "[w]hile there is a prepayment prohibition, which is not enforceable in this context, there is no prepayment penalty provision provided for anywhere in the contract. Therefore, there can be no prepayment fees, costs, or charges allowed under the confirmed Plan as none are provided for in the note under § 506(b)." *Memorandum Opinion* at 10. Moreover, there is no reported decision which allows a prepayment premium in the absence of a prepayment premium

12. It is important to note that the facts of *In re A.H. Robins* are distinguishable. In that case, the court relied heavily upon the fact that the amount of the claim was unknown—unknown because one jury awarded plaintiffs $7.5 million in punitive damages while a second jury awarded only $5. The court held that enforcing the unknown liability would scuttle the Bankrupt's reorganization because the unknown quantity of the claim "renders compliance with numerous provisions of the Bankruptcy Code virtually impossible." 89 B.R. at 562. Here, uncertainty about the value of Continental's claim is not an issue. However, the premise of the court's holding is apposite.

13. Similarly, Continental has not demonstrated that it is likely to succeed on appeal in showing that the bankruptcy court exercised its equitable authority improperly by permitting prepayment. Continental does not argue that the equities of the case favor enforcement of the prepayment prohibition. It simply assumes its case, ignoring the equitable calculations the bankruptcy court is required to make.

formula provision being set forth in the instrument.[14]

Continental argues that § 506(b) is not the end-all of damages. It argues that it is entitled to damages despite the fact that the Note does not provide for them. Presumably, Continental relies on general contract principles for support.[15] However, Continental again ignores the bankruptcy court's equitable power to disallow damages claims. For example, in *A.H. Robins*, discussed above, the bankruptcy court refused to allow a damages claim, already awarded by a jury, on the grounds that doing so would jeopardize the debtor's reorganization. Indeed, there are several cases where bankruptcy courts have refused to award prepayment penalties even though the instrument at issue *included* a prepayment penalty provision. *See, e.g., In re Skyler*, 80 B.R. 500 (Bankr.C.D.Cal.1987) (prepayment penalty provision void because unreasonable); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708 (Bankr.D.Md. 1993) (same).

Continental simply does not address the equities of allowing a damages award in this case. It does not recognize that its breach of contract claim exists in the context of a bankruptcy proceeding. Continental offers nothing to counter the bankruptcy court's determination that it is unfair to saddle Shenandoah with a substantial damages claim while it is trying to reorganize. Thus, Continental has not met its burden in making a "strong showing" that the bankruptcy court clearly erred in denying Continental's claim for damages.

■ Continental also argues that its claim is "impaired" under § 1124(3) because the Plan does not purport to pay Continental's claim until 10 days after the Confirma-

tion Date. The Confirmation Date is the date on which the order of the bankruptcy court confirming the Plan becomes a Final Order. A Final Order is defined as "an order or judgment which has not been reversed, stayed, modified or amended and as to which no appeal is pending and the time to appeal and to seek leave to appeal or to seek review or rehearing has expired." *Second Amended Plan of Reorganization* at ¶ 2.18. Of course, under such a definition, a Final Order might not be entered for a considerable amount of time. Continental urges that since it is possible that it might not be paid for a period of several months, its claim is necessarily "impaired." Continental cites no authority for its position, nor does the statute provide a time period within which a claim must be paid in order to be considered "unimpaired."

Although the court is troubled by this potential delay in the cash distribution, it is of the opinion that the potential delay does not render Continental's claim "impaired." Case law suggests that the timing of the payments under the Plan comports with the requirements of § 1124(3). For example, in *In re Wonder Corp. of America*, 70 B.R. 1018 (Bankr.D.Conn.1987), the court rejected the precise argument made by Continental. In that case, the "Payment Date" was defined as "the 20th business day following the date on which the Confirmation Order becomes a Final Order." *Id.* at 1019. A Final Order was defined exactly as it is under Shenandoah's Plan. *Id.* at 1019–1020. The creditors argued that their claims were impaired because the Payment Date was indeterminate—it was tied to the occurrence of future events, the precise timing of which was unknown.[16] The creditors asserted that the

---

**14.** Note that even if there had been a penalty provision included in the Note, the bankruptcy court would first have to find that the provision is reasonable before including it in the Plan. *See, e.g., In re Skyler Ridge*, 80 B.R. 500 (Bankr. C.D.Cal.1987) (voiding prepayment penalty provision as unreasonable under § 506(b)).

**15.** Although Continental does not raise the point, it may be instructive to note that § 502(g) of the Bankruptcy Code permits creditors to bring claims against a debtor for damages arising from a Trustee's rejection of an executory contract

under § 365. Of course that is not the precise situation here. More importantly, however, the bankruptcy court must allow or disallow such claims in accordance with the other provisions of § 502 which, as discussed by the court in *A.H. Robins*, contemplates the bankruptcy court's exercise of its equitable powers.

**16.** The creditors also argued that their claims were impaired under § 1124(3) because the Plan did not provide for payment on the "effective date" of the Plan since the Plan did not provide for an effective date. Although Continental does

effective date must be a short period after confirmation if not the date of confirmation itself.

The court rejected this argument stating that "[w]hile this may be conceptually attractive, in the real world of bankruptcy reorganization, it may not be attainable." *Id.* at 1020 (internal citations omitted). The court continued:

> In considering the relationship between the effective date and the entry of a confirmation order, courts should be mindful of the fact that a Chapter 11 plan is very often the end result of a long process marked by considerable controversy and negotiation, and that during that process, the prepetition rights and expectations of creditors are at least temporarily subordinated to the public policy of giving qualified debtors an opportunity for a fresh start.
>
> \* \* \* \* \* \*
>
> Although § 1124(3) is silent as to the timing of the effective date, Congress could not have intended to eliminate a creditor's negative vote unless § 1124(3) were meant to be read as requiring some reasonable limitation on the interval between the confirmation order and the effective date of the plan. In the absence of a specific statutory formula, courts must supply such meaning, so that the effective date is linked to the happening of a particular event and is no later than is reasonably necessary to accomplish a legitimate purpose such as the determination of administrative expenses or the resolution of objections to claims. Here the effective date . . . is not such an unreasonably long time as to conflict with the equitable balances set by Chapter 11. Indeed, it is not uncommon for a plan to fix the effective date to a time after the confirmation order is final in recognition of a prospective lender's reluctance to advance funds until the appeal period has passed.

*Id.* at 1020–1021.

The court is persuaded by this reasoning and adopts it, especially in light of the simi-larities in the language of the Chapter 11 Plan considered by the court in *In re Wonder Corp. of America* and the Plan under consideration here. Moreover, cases holding that delay in payment create an "impaired" claim under § 1124 are factually distinguishable. For example, in *In re Haardt,* 65 B.R. 697 (Bankr.E.D.Pa.1986), the court held that a creditor's rights were impaired under Chapter 11 where payment on the claims might take place 120 days or more after confirmation. Similarly, in *In re Country U.S.A., Inc.,* 74 B.R. 28 (Bankr.S.D.Fla.1987), the court ruled claims impaired where the debtors proposed to pay them in quarterly installments, beginning 90 days after the effective date of the plan. These conditions appear much more burdensome then the 10 day, post-Confirmation Date deadline created under Shenandoah's Plan.

In short, the bankruptcy court found that it had adequately valued Continental's allowed claim and that the Plan requires Shenandoah to pay Continental that allowed claim in full. Thus, the court ruled that Continental is not an "impaired" creditor under subsection (3). Continental has not made a "strong showing" that the bankruptcy court's judgments are in error.

### (2). *Section 1124(1)*

█ The bankruptcy court also concluded that Continental is not an impaired creditor under subsection (1). Continental argues that it is an impaired creditor under that subsection because its legal, equitable, and contractual rights under the Note have been altered by the Plan. Simply stated, Continental argues that the Note provides for a guaranteed stream of income payable over time. However, the Plan provides for immediate payment of the Note in full. Thus, Continental asserts that its contractual rights under the Note have been altered by the Plan.

Although at first blush Continental's argument appears to have some force, it does not

---

not raise a similar argument here—the term "effective date" is not contained in Shenandoah's Plan—the court notes that such an argument would be meritless because "[a]lthough 'effective date' is not specifically defined in the Plan, it is

apparent from the definition contained in the [Plan], that the ["Confirmation Date"] is the effective date of the Plan and that the [creditors] are to be paid on that date." *In re Wonder Corp. of America,* 70 B.R. at 1020.

withstand scrutiny. The terms of the Note have not been altered. The terms of the Note state, in essence, that in the event Shenandoah prepays the Note, Continental has no remedy even though the Note forbids such prepayment. This perhaps anomalous result is the product of sloppy draftsmanship—it is not a creation of the bankruptcy court in confirming the Plan. The court is simply enforcing the precise terms of the Note. To the extent the court is "vitiating" the Note, it is doing so because the terms of the Note allow it to do so. While it is true that Continental is not receiving what it thinks it is entitled to under the Note, that does not suggest the Note has been "altered" by the Plan. It may simply suggest that Continental is wrong about the nature of the rights created by the Note. Although this argument may border on the sophistic, it is somewhat immaterial given that even if Shenandoah's Plan does "alter" Continental's contractual rights, Continental's claim is still unimpaired since the Plan provides Continental its allowed claim in full pursuant to § 1124(3).

### (b). GOOD FAITH AND FEDERAL LAW UNDER § 1129(a)(3)

■ In addition to arguing that it is an "impaired" creditor, Continental argues that the Plan cannot be confirmed because it is violative of § 1129(a)(3). That provision provides that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Continental maintains that the Plan fails on both fronts. It alleges that the only reason Shenandoah filed its petition was to extricate itself from the obligations imposed under the Note. It argues that Shenandoah is solvent [17] and that it has had no problem satisfying its debts in the past. The bankruptcy court, however, concluded that "[a]fter listening to the proof presented in this hearing as well as the multitude of other courtroom proceedings in this matter, it has never been the opinion of this Court that this Chapter 11 proceeding was not in good faith.... No evidence has ever

been presented to this Court that the debtor had any motives other than its financial reorganization." *Memorandum Opinion* at 10–11.

■ Bankruptcy Rule 8013 provides that a bankruptcy judge's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Bankr.R. 8013, 11 U.S.C. A finding of fact is "clearly erroneous" "when, although there is evidence to support it, the reviewing court ... is left with the definite and firm conviction that a mistake has been made." *In re Morris Communications NC, Inc.*, 914 F.2d 458, 467 (4th Cir. 1990) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). On appeal, this court is required to afford the bankruptcy court's findings of fact substantial deference. Thus, it is unlikely that this court would disturb the bankruptcy court's finding that the Plan was proposed in good faith.

■ Continental also argues that confirming the Plan would violate federal law because federal law requires the enforcement of lockout provisions when a government agency, such as H.U.D. in this case, has guaranteed the debt instrument. Continental cites several cases for the proposition that courts generally must enforce lockout provisions when a government agency has guaranteed the debt at issue.[18] *See, e.g., Parkridge Investors Ltd. v. Farmers Home Admin.*, 13 F.3d 1192, 1195 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994).

It may be sufficient to note that none of the cases cited by Continental for its proposition were actions in bankruptcy, where courts, acting in equity, must consider many conflicting interests. Moreover, in the *Parkridge* case, one of two Court of Appeals cases cited by Continental for its proposition,

---

**17.** Note that insolvency is not a prerequisite to filing a bankruptcy petition. *See* 11 U.S.C. § 109.

**18.** Continental's argument here is really a version of the public policy arguments addressed under the fourth prong below.

a federal statute [19] explicitly prohibited prepayment by borrowers who were building low-income housing, unless the borrower followed to conclusion "an intricate, six-month (or longer) procedure" that included offering to sell the project to a qualified nonprofit organization or to a public agency. *Parkridge,* 13 F.3d at 1196. Indeed, the regulations implementing the statutory prepayment prohibition comprise 23 pages in the relevant C.F.R. volume, exclusive of exhibits.

In stark contrast to the disfavored status of prepayment of debts under the statute in *Parkridge* is the language of the regulation, cited by Continental, which spawned the Note in this case. 24 C.F.R. 232.37 states that "Except as otherwise provided in paragraph (c) of this section, the mortgage *shall* contain a provision *permitting* the mortgagor to prepay the mortgage in whole or in part upon any interest payment date after given to the mortgagee 30 days' notice in writing in advance of its intention to so prepay." 24 C.F.R. § 232.37(a)(1) (emphasis supplied).[20] Thus, the statutory scheme under which the Note was created requires debt instruments to allow for prepayment unless otherwise agreed to by the parties. Obviously, this requirement refutes any contention that prepayment prohibitions, and the robust enforcement of the same, are essential for the statutory scheme to be effective. Far from violating federal law, allowing prepayment comports with Congress' stated preference for allowing Mortgagors' to prepay their debts.

Continental also cites *Mendrala v. Crown Mortgage Co.,* 955 F.2d 1132 (7th Cir.1992), for its proposition that the Plan, by failing to enforce the lockout provision, is violative of federal law. *Mendrala,* however, is not on point. The issue in *Mendrala* was whether the Federal Home Loan Mortgage Corporation (FHLMC) could be bound or estopped by the unauthorized actions of its loan servicer. The unauthorized action in the case was the acceptance by the loan servicer of a prepayment of a debt, notwithstanding an

applicable lockout provision. The borrowers did not argue that the lockout provision was unenforceable. Rather, they argued that FHLMC was bound by the action of the loan servicer. Thus, the court did not address whether a failure to enforce the lockout provision would constitute a violation of federal law. Continental is simply unable to show that the Plan is violative of federal law.

In summary, Continental has not made a "strong showing" of likely succeeding on the merits. Continental's argument that the bankruptcy court inadequately valued its claim, thereby impairing it, ignores the formidable equity power of the bankruptcy court in allowing claims. Moreover, Continental is unpersuasive in arguing that the Plan is violative of federal law. Finally, this court on appeal will be wary of overruling the bankruptcy court's finding that the Plan was proposed in good faith.

### D. The Public Interest

Continental argues that the failure of this court to grant a stay pending appeal will have significant adverse consequences on the public. Specifically, it argues that denial of its motion will "adversely affect ... the market for HUD-insured loans and their subsequent resale or securitization in the credit markets." *Appellant's Support Memorandum at 12.* Moreover, Continental asserts that denial of its motion "will have a significant and potentially devastating impact on all other parties who hold such obligations." *Id.* at 13.

Continental's public policy argument overlooks the fact that the Note did not contain a prepayment premium provision. Although as a general matter, the public interest may require a court to enforce lockout provisions, that policy concern is substantially lessened, if not eviscerated, when the contract itself does not contain an enforcement provision. A court is ill-advised to enforce a lockout provision where the Note itself, written by sophisticated parties who understand both

---

**19.** The statute at issue in the case was the Emergency Low Income Housing Preservation Act of 1987.

**20.** The regulations do allow parties to include prepayment prohibitions and penalty provisions if the parties so agree. 24 C.F.R. § 232.37(c). However, the language is, obviously, permissive and not mandatory.

that prepayment is always a possibility and that prepayment penalty provisions are commonly utilized, does not provide a remedy for a violation of its terms. Indeed, instead of adversely impacting the market for H.U.D.-insured loans, refusing to enforce the lockout provision will create incentives for better draftsmanship with respect to such Notes, thereby increasing their value. Most significantly, however, the general policy concerns inherent in enforcing lockout provisions are counterbalanced in the bankruptcy context where the court must also consider the public interest in administering the Bankruptcy Code. On balance, the public interest in equitably administering the Bankruptcy Code outweighs the public interest in enforcing a lockout provision where the Note itself lacks a provision enforcing the lockout.

### III.

Although Continental has a colorable claim that it will suffer irreparable harm in the absence of a stay, that harm is countered somewhat by the harm to Shenandoah should the court issue the stay. Thus, Continental is forced to make a "strong showing" of the likelihood of succeeding on the merits. Continental has failed to do so. Moreover, to the extent public policy concerns are implicated, they weigh in favor of denying the motion for a stay. Accordingly, the motion for a stay pending appeal is denied.