Tommy O'BRIEN, et al., Plaintiffs,

v.

APPOMATTOX COUNTY, VIRGINIA, et al., Defendants.

No. Civ.A. 6:02 CV 00043.

United States District Court, W.D. Virginia.

Aug. 2, 2002.

---

James B. Slaughter, Cindy L. Squires, Beveridge & Diamond, P.C., Washington, DC, for plaintiffs.

James Edward Cornwell, Jr., Daniel M. Siegel, Lloyd Lee Byrd, Margaret Ann Neil Cosby, Sands, Anderson, Marks & Miller, P.C., Richmond, VA, for defendants.

*MEMORANDUM OPINION*

MOON, District Judge.

## I.

This matter is before the Court on Plaintiffs' motion for a preliminary injunction. For the reasons stated below, the motion is GRANTED in part and DENIED in part. Plaintiffs are eleven farm or farm operators in Appomattox County, Virginia. The lead Plaintiff, Mr. Tommy O'Brien ("O'Brien"), is a cattle farmer in the County who wishes to apply biosolids to 322 acres of farmland, which he uses partly for pasture and partly for hay production. Defendants are Appomattox County ("Appomattox" or "the County"), the Board of Supervisors for the County, and Darrell A. Carroll, Jr., County Administrator. Plaintiffs have brought this lawsuit to challenge two County ordinances that relate to the use of "biosolids" (also known as "sewage sludge" or "sludge") as a commercial agricultural fertilizer. During the pendency of this case, Plaintiffs seek a temporary injunction, prohibiting the County from enforcing either of these ordinances against the farmers who have brought this suit.

Biosolids are the solid, semi-solid, or liquid byproducts culled from waste water treatment facilities. Treatment plants, particularly ones near major cities such as Washington, D.C., or New York, NY, face difficulties in disposing of these byproducts. The facilities usually deposit the sludge in landfills or incinerators. However, after being treated to remove as many pathogens and carcinogens as possible, biosolids can be applied to a farmer's field as a substitute for commercially available fertilizers. Many in the farming community have responded enthusiastically to the use of biosolids. Because biosolids are trucked to farms and land-applied at no cost to the property owner, they provide farmers with an effective, nutrient-rich fertilizer for free.

Not surprisingly, the use of treated, human waste on agricultural land has raised some questions as to its health and safety. There are concerns about bacteria, viruses, heavy metals, and other pollutants that may find their way into public waterways. Additionally, a Virginia Tech report notes that, "[b]iosolids, even when properly treated, will have odors . . . . [that] may be objectionable, even to rural communities accustomed to the use of animal manure." The report concludes, however, that "the preponderance of scientific evidence indicates that land applying biosolids of the quality currently generated according to the regulations established by the U.S. EPA and the Commonwealth of Virginia will not result in significant detrimental health or environmental impacts." Thus, many in the scientific community, insist that there are no cognizable dangers to the public, so long as sludge is properly treated before application. Other researchers, however, reason that it is impossible to declare biosolids safe or unsafe without further study.

Nevertheless, the above-ground, land application of sludge has been practiced for several decades in Virginia, the United States, and Europe. The practice is regulated by the federal government through the EPA, and by the State through the Virginia Department of Health ("VDH"). According to VDH, in 2001, 42,400 acres of land in thirty-three Virginia counties were fertilized with biosolids. The number of farmers who use biosolids continues to grow, and if the practice were to begin in Appomattox, the County would become the thirty-eighth Virginia county to use biosolids. To date, biosolids have never been applied to Appomattox County farmland.

On August 6, 2001, VDH received a "technically complete request for issuance

of a Biosolids Use Operation Permit" from Synagro Mid Atlantic, Inc., ("Synagro"), a "residuals management company." Shortly thereafter, on September 4, 2001, the Board of Supervisors of Appomattox County held a public hearing on a proposed ordinance to regulate the land application of biosolids. On September 10, 2001, Nutri–Blend, Inc., another biosolids provider, submitted its application to VDH for a Biosolids Use Operation Permit. The race between the Board of Supervisors and the biosolids community was on.

On February 4, 2002, the Board adopted an ordinance ("the zoning ordinance") creating the "Agricultural A–1 Intensive Farming Overlay District." Land application of biosolids would be tightly regulated within the new zoning district. Biosolids would be wholly prohibited anywhere else in the county, including land zoned Agricultural A–1 that had not been designated as an Intensive Farming Overlay District. Currently, eighty-percent of the County is zoned Agricultural A–1. There are no areas that have been designated for the use of biosolids. To be re-zoned as an Intensive Farming Overlay District, a land owner would have to apply to the County directly, much as if he or she were seeking a special use permit.

On March 18, 2002, the Board adopted a second ordinance ("the police powers ordinance"). The stated purpose and intent of this regulation was to "establish a procedure whereby the land application of Class B biosolids may be monitored to ensure compliance with all applicable state and local regulations." The ordinance would require, among other things, that a biosolids contractor "filed a Contractor Pledge with the County no less than twenty-eight (28) days prior to submitting an application for a Biosolids Use Permit to VDH." In addition, the ordinance prohibited the above-ground application of sludge, and instead required that any application be done through direct soil injection. Finally, the Board made no secret of its opinion about biosolids usage. Section 95–1 of the ordinance noted that "it is the intent of the Board of Supervisors to immediately impose a ban on land application of biosolids, if the General Assembly or the Virginia Supreme Court modifies current law to grant localities the authority to enact such a ban."

On March 29, 2002, VDH approved both the Nutri–Blend, Inc., and Synagro, Inc., Biosolids Use Operation Permits. The permits noted, however, that "Conformance to all local zoning and planning requirements is to be addressed separately by [the permit holders] with the County." Plaintiffs signed agreements with either Nutri–Blend or Synagro, Inc., for those businesses to apply biosolids on their fields, in accordance with the VDH permits. On June 28, 2002, claiming that the County's ordinances effectively prohibited the application of biosolids despite the existence of the permits, Plaintiffs filed this lawsuit.

## II.

■ In deciding whether to grant a preliminary injunction, this Court should consider: 1) the likelihood of irreparable harm to Plaintiffs if the request for an injunction is denied; 2) the likelihood of irreparable harm to Defendants if the request is granted; 3) Plaintiffs' chance of success on the merits; and 4) the public interest. *See MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir.2001); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 195–97 (4th Cir.1977). In considering these four factors, "the first step . . . is for the court to balance the likelihood of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant." *Blackwelder*, 550 F.2d at 195. In fact, "although [a court] may properly consider

the four general factors" outlined above, "[t]he two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree." *Id.* at 196. Thus, the focus of this Court's analysis begins with the "balance-of-hardship" test.

### A.

Plaintiffs insist that, as farmers and farm operators, they will suffer irreparable harms if the injunction is not granted, because they have an ongoing and immediate need for the biosolids. There is no doubt that if the two County ordinances are applied in full, that Plaintiffs will be prohibited from using biosolids on their fields, at least for the duration of this summer. In his affidavit, Plaintiff Tommy O'Brien states that without biosolids, he will be required to spend at least $65,000 on alternative fertilizers (the biosolids, as stated above, are provided to him for free) and will lose approximately $15,000 due to reduced hay yields. He claims that in addition to these monetary damages, he will suffer the loss of "the environmental and conservation benefits of biosolids to [his] property," along with additional environmental "damages from reverting to chemical fertilizers."

Beyond these economic losses, Plaintiffs claim that they will lose many nutrients that are amended to the soil through biosolids, but are not routinely supplied by chemical fertilizers. Because of nutrient-rich compounds in treated sewage sludge, their land application can consistently boost hay and pasture growth. Thus, the long-term benefits from the use of biosolids include more productive fields and less reliance on chemical fertilizers.

A particularly acute harm Plaintiffs face is from the continuing drought. It is well-known that Virginia is in the midst of its worst drought in decades. Obviously, the farming community has been severely and adversely affected by the climate conditions. According to the expert witness declaration of W. Lee Daniels, a professor in soil environmental science at Virginia Tech, land application of biosolids "could be an important factor in assisting the soil-plant community [to] sustain reasonable levels of production during the ongoing drought." Roger Hatcher, a farmer in Cumberland County, Virginia who uses biosolids, testified that "[b]iosolids have been an effective tool in mitigating periods of low rainfall on my farm. For example, during extremely dry conditions in 1998, the only acreage that produced a second cutting of hay was acreage receiving biosolids as a soil amendment . . . . . There is no doubt that biosolids are particularly important in very dry weather."

Defendants do not dispute the effectiveness of biosolids in the field. However, they argue that the losses that Plaintiffs will suffer are purely economic losses, and are thus not "irreparable." The County notes that Plaintiffs "are still able to apply commercial fertilizers or composts . . . . While such other fertilizers may not be 'free,' they are readily available . . . ." Defendants are correct that, generally, a mere economic injury, standing alone, is insufficient to show an *irreparable* harm. *See Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Hughes Network Systems, Inc. v. InterDigital Communications Corp.,* 17 F.3d 691, 694 (4th Cir.1994). Yet when extraordinary circumstances effectively eliminate the opportunity to recover money damages, "the requisite 'irreparable harm' may be deemed present despite the otherwise ascertainable nature of the injuries." *Synagro–WWT, Inc. v. Louisa Co.,* 2001 WL 868638, at *4 (W.D.Va. July 17, 2001) (citing *Hughes,* 17 F.3d. at 694).

■ • In this case, Plaintiffs acknowledge that they will be unable to recover money damages on their state-law claims because of the County's right to assert the defense of sovereign immunity. In *Synagro–WWT, Inc.,* a case with nearly identical facts to the one presently before this Court, Judge Michael granted Synagro, Inc.'s request for a preliminary injunction, noting that "calculable losses that would otherwise preclude Synagro's preliminary injunction request are appropriately considered irreparable" because of Louisa County's claim of sovereign immunity. 2001 WL 868638, at *4 (citing *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 361 (4th Cir.1991) (holding that the irreparable harm requirement should be less strict when a defendant can assert the defense of sovereign immunity)).

Defendants counter that Plaintiffs will be able to recover fully for their economic damages on their federal claims under 28 U.S.C. § 1983. It is true that Plaintiffs can theoretically recover money damages through their § 1983 claims. However, while Plaintiffs are likely to succeed on the merits of their state-law claims (as explained below), the same cannot be said of their federal causes of action. Plaintiffs claims based on the commerce clause, the equal protection clause, the due process clause, the supremacy clause and the Clean Water Act are all unlikely to survive Defendants' pending motion to dismiss pursuant to Rule 12(b)(6), or a future Rule 56 motion for summary judgment. Thus, Plaintiffs' sole remedy will be to look to their state-law causes of action, for which money damages are unavailable.

Furthermore, not all of Plaintiffs' damages can be calculated in economic terms. The injury to the environment from increased use of chemical fertilizers, which would inevitably accompany a ban on biosolids, is an irreparable harm that cannot be easily translated into a dollar amount. Similarly, the long-term benefits to the soil from continued biosolids use are not immediately quantifiable. In sum, Plaintiffs have shown that they will suffer immediate, significant, and acute irreparable harms if their motion for an injunction is denied.

### B.

Defendants claim, however, that granting the motion will cause them certain, irreparable harms. Specifically, Defendants note that Appomattox County citizens will be compelled to endure the presence of the offensive odors that are inevitably associated with sewage sludge. These odors "may be objectionable, even to rural communities accustomed to the use of animal manure." In addition to the odors, Defendants cite to the possibility of adverse health and environmental impacts that could result from pollutants in the biosolids leaching into the County's water system. They concede, however, that there is no evidence in the record of any articulable, environmental harm that would result from the use of biosolids. Rather, Defendants only claim, "The record in this case establishes a *bona fide* disagreement in the scientific community with regard to the potential adverse health effects of biosolids." Thus, instead of suffering any immediate, irreparable harm, Defendants only face the potential for uncertain, future injuries—the fear of possible, adverse health effects.

■ This Court does not wish to minimize the legitimacy of these potential injuries. In fact, the Supreme Court has stated that a reasonable fear of a future, environmental harm is an "injury in fact" for the purposes of satisfying constitutional standing requirements. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.,* 528 U.S. 167, 184, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). However, Defen-

dants' fears are not as certain, as identifiable, or as severe as the future damages claimed by Plaintiffs. Furthermore, to the extent that there is a question as to the safety of biosolids, the Virginia General Assembly and the U.S. EPA have already answered it, at least for the time being. Both VaCode Ann. § 32.1–164.5, and 40 C.F.R. §§ 503.10, *et seq.*, expressly permit the above ground application of sewage sludge. That is, the federal and state authorities that have considered the question have determined that biosolids can be safely used on farmland. Therefore, in balancing the hardships that would be imposed either by the grant or denial of an injunction, this Court finds that the balance tips strongly in favor of Plaintiffs.

## C.

■ "[A]lthough [a court] may properly consider the four general factors" of the *Blackwelder* test, "[t]he two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree." *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir.1977). In this case, not only does the balance-of-hardships test weigh heavily in favor of the Plaintiffs, but the third prong of the *Blackwelder* test—the likelihood of success on the merits—also supports the granting of an injunction.

The core of Plaintiffs' complaint is that the two, Appomattox County ordinances were passed in violation of Virginia state law. The legal framework surrounding biosolids can be summarized as follows. Pursuant to §§ 405(d) and (e) of the Clean Water Act, the EPA has promulgated requirements, pollution limits, and management practices relating to the land application of sewage sludge. *See* 40 C.F.R. §§ 503.10, *et. seq.* In addition to its own regulations, the EPA provides, "Nothing in this part precludes a State or political subdivision thereof or interstate agency from imposing requirements for the use or disposal of sewage sludge more stringent than the requirements in this part or from imposing additional requirements for the use or disposal of sewage sludge." 40 C.F.R. § 503.5.

The Board of Supervisors has the general authority to promulgate ordinances relating to its zoning and police powers. However, any county ordinance "must not be inconsistent with the Constitution and laws of the United States or of this Commonwealth." Va.Code Ann. § 1–13.17. The Virginia Department of Health ("VDH") is authorized to promulgate regulations relating to the issuance of permits, and has issued several regulations on this question. *See* Va.Code Ann. § 32.1–164.5. Particularly relevant to the present case is the requirement that any application for a biosolids use permit comply with "local government zoning and applicable ordinances." 12 VAC 5–585–620. The regulations also state that "Conformance to local land use zoning and planning should be resolved between the local government and the facility owner or permit holder," without VDH's further involvement. 12 VAC 5–585–260.

The Supreme Court of Virginia has expounded upon the meaning of these statutes and regulations. In *Blanton v. Amelia County*, the court was confronted with two ordinances that attempted to institute an outright ban on the use of biosolids in Amelia County. 261 Va. 55, 540 S.E.2d 869 (2001). One ordinance, drafted pursuant to Amelia's zoning powers, was titled, "A Zoning Ordinance Banning the Placement of Biosolids in Any Zoning District." *Id.* at 871. The other ordinance, adopted under the guise of Amelia's general police powers, was "An Ordinance Banning the Placement of Biosolids on Any Land in the County." *Id.* The *Blanton* court struck

down both ordinances as inconsistent with state law. "As we have clearly and repeatedly stated, a local government may not forbid what the legislature has expressly licensed, authorized, or required." 540 S.E.2d at 874.

Defendants attempt to distinguish their ordinances from the ones at issue in *Blanton*. The County claims that it is merely regulating the use of biosolids, as part of the regulatory framework envisioned by the General Assembly and the Virginia Department of Health. However, post-*Blanton* amendments to the Virginia Code make it clear that counties have only limited and narrow authority to regulate sewage sludge. During the 2001 legislative session, the General Assembly passed Va. Code Ann. § 62.1–44.19:3(C). It provides, "Any county, city, or town may adopt an ordinance that provide for the testing and monitoring of the land application of sewage sludge within its political boundaries to ensure compliance with applicable laws and regulations." In an official opinion, the Attorney General has opined that this provision "expressly limits the authority of localities to regulate biosolids activities" on the theory that "when the General Assembly expressly bestows certain powers in a statute, it intends to exclude those powers which have been omitted." Op.Va. Att'y Gen., 01–085 (March 29, 2002).

Additional legislative activity from the 2002 General Assembly session supports the Attorney General's conclusion. House Bill 1103, which was passed by both the House of Delegates and the Senate, was approved by the Governor on April 1, 2002 and has become Chapter 291 of the Acts of Assembly of the 2002 Legislative Session. It provides that the responsibility to regulate the land application of sewage sludge shall be moved from the Department of Health to the State Water Control Board and the Department of Environmental Quality. While this Act does not become

effective until May 1, 2004, it does provide insight into the General Assembly's understanding of the role of counties in regulating biosolids.

Chapter 291, for example, authorizes State agencies to establish:

"1. Requirements and procedures for the issuance and amendment of permits as required by this section;

2. Procedures for amending land application permits ...

3. Standards for treatment or stabilization of sewage sludge....

4. Requirements for determining the suitability of land application sites and facilities used in land application....

5. Required procedures for land application, marketing and distribution of sewage sludge....

8. Conditions where a nutrient management plan approved by the Department of Conservation and Recreation may be required."

The chapter specifies several additional powers given to the State agencies that are charged with regulating the land application of biosolids or sewage sludge. In short, it provides for comprehensive and thorough State-level controls. Counties, the legislation notes, remain limited by Va.Code Ann. § 62.1–44.19:3(C), which only authorizes localities to adopt an ordinance providing for testing and monitoring.

Further study of the 2002 Virginia Legislative Session demonstrates that the "testing and monitoring" limitation was intentional. Senate Bill 618, for example, which would have amended this section of the Code, states:

Any county city or town may adopt an ordinance that provides for the prohibition, restriction, or regulation of the land application of sewage sludge within such

locality. Any such ordinance may provide for a fee to cover the cost of testing and monitoring of the land application of sewage sludge within its political boundaries to ensure compliance with applicable laws and regulations and locally adopted ordinances.

Obviously, SB 618 grants localities far more expansive powers than does existing law, as preserved by Chapter 291. Senate Bill 618, however, never made it out of committee. In fact, none of the additional powers listed in SB 618 were included in Chapter 291. Most notably, neither Chapter 291 nor Va.Code Ann. § 62.1–44.19:3(C) grant counties the authority to adopt ordinances relating to the "regulation of the land application of sewage sludge."

In sum, it appears that counties have no authority to regulate biosolids beyond their powers to conduct testing and monitoring. This conclusion is not affected by VDH regulations, which only observe that any application for a Biosolids Use Permit must comply with "local government zoning and applicable ordinances." 12 VAC 5–585–620. This statement is merely an acknowledgment that permit holders must comply with previously existing zoning regulations. That is, a permit holder cannot land-apply biosolids in areas zoned for non-agricultural uses. It is no different than acknowledging that the holder of a permit to operate a stationary air pollution source under Va.Code Ann. §§ 10.1–1300, *et seq.*, cannot use that permit to construct a power plant in the center of a residential neighborhood.

Finally, a quick review of the two Appomattox ordinances shows that these ordinances likely were intended as an effective ban on the application of sewage sludge throughout the entire County. After all, the County's stated goal, as enunciated in the police powers ordinance, is "to immediately impose a ban on land application of biosolids, if the General Assembly or the Virginia Supreme Court modifies current law to grant localities the authority to enact such a ban." The police powers ordinance then requires that contractors, such as Synagro and Nutri–Blend, "file a Contractor Pledge with the County no less than twenty-eight (28) days prior to submitting an application for a Biosolids Use Permit to VDH." The Board passed this ordinance in February, several months after it knew that Plaintiffs had submitted their permit applications to VDH. Thus, the County knew that this section of the ordinance would effectively invalidate any permit that the Plaintiffs would receive from VDH.

Both the police power and the zoning ordinances state that "No land application of biosolids shall occur [anywhere in the County] on slopes in excess of 7%." Presumably, this provision is to control runoff of biosolids, something that VDH permitting process already addresses. However, the County provides no scientific explanation for why it chose 7% as a maximum slope. Furthermore, a farmer might be reluctant to apply biosolids on a slope close to a 7% gradient, out of a fear for criminal prosecution. Section 95–12 of the police powers ordinance states that any violation of the ordinance, however incidental, is a Class I misdemeanor, and that "[e]ach day a violation exists shall constitute a separate offense." That is, if a farmer land-applies biosolids on a field that is later measured to have a 7.5% slope, and it takes the farmer a month to remove the biosolids from the ground, he could still be charged in a thirty-count indictment for violating the ordinance.

In conclusion, it is likely that Plaintiffs will succeed on the merits of their state-law claims, at least insofar as Defendants' ordinances reach beyond the County's role

in testing, monitoring, and legitimate zoning related to sewage sludge.

## D.

The fourth *Blackwelder* factor is the public interest in either granting or denying an injunction. Both Plaintiffs and Defendants agree that in this case, with the scientific uncertainty surrounding the safety of biosolids, the public interest is best served in maintaining the status quo. The Fourth Circuit also acknowledges "the 'public interest' in preserving the *status quo ante litem* until the merits of a *serious* controversy can be fully considered by a trial court." *Blackwelder*, 550 F.2d at 197 (Emphasis in original). In this case, however, the parties disagree as to what the *status quo ante litem* is.

Defendants argue that, to date, no biosolids have ever been applied to the farms in Appomattox County. Thus, they posit that a ban on biosolid application in the County will preserve the *status quo* by leaving Plaintiffs "to apply commercial fertilizers or composts, as they have presumably been doing all along." Defendants argument, while initially attractive, misstates the *status quo* as far as the law is concerned.

■ Prior to the passage of these ordinances, Plaintiffs were free to approach VDH and seek a Biosolids Use Permit. That is, the *status quo* in Appomattox County was that there were no ordinances effectively banning the land application of sewage sludge. This does not mean that there were no regulations on biosolids use. As explained above, the VDH regulations, combined with U.S. EPA controls, existed to ensure that sewage sludge was properly treated and handled throughout the land application process. "Because the state regulatory system can at the very least act as an interim safeguard during the term of a preliminary injunction, the public's interest in ensuring the compatibility of local

ordinances with [state law and the rulings of the Virginia Supreme Court] outweigh[ ] any health concerns regarding the application of biosolids." *Synagro–WWT, Inc., v. Louisa Co.*, 2001 WL 868638, at *8 (W.D.Va. July 17, 2001). Thus, the public interest favors the granting of the injunction, as it is delineated in the Order of the Court.

## III.

For the reasons stated above, Plaintiffs' motion for a preliminary injunction is GRANTED in part and DENIED in part. It is GRANTED in that Defendants are enjoined and prohibited from enforcing the ordinances at issue with regard to the eleven Plaintiffs.

The motion is DENIED, in that the following restrictions on the land application of biosolids remain in effect, to wit:

1. Pursuant to its zoning authority, the County may restrict the land application of biosolids to the previously existing Agricultural A–1 District only;

2. Pursuant to its authority to conduct testing and monitoring of the land application of biosolids, the County may require that prior to any application, a contractor must submit to the Zoning Administrator:

    a. Identification of all properties where land application will occur, listed by Appomattox County Tax Map Identification Number;

    b. Schedule of dates for land application. The contractor may initially provide a range of dates for potential application, but it is the contractor's responsibility to update and maintain the schedule as dates are confirmed for current and subsequent land applications;

    c. Name and address of the property owner, and, where applicable, the lessee.

It is FURTHER ORDERED that this injunction shall remain in effect during the pendency of this case or until further order of this Court.

### ORDER

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. For the reasons stated in the attached Memorandum Opinion, the motion is GRANTED in part and DENIED in part.

The motion is GRANTED in that Defendants shall be, and hereby are, enjoined and prohibited from enforcing the ordinances at issue with regard to the eleven Plaintiffs.

The motion is DENIED, in that the following restrictions on the land application of biosolids remain in effect, to wit:

1. Pursuant to its zoning authority, the County may restrict the land application of biosolids to the previously existing Agricultural A–1 District only;

2. Pursuant to its authority to conduct testing and monitoring of the land application of biosolids, the County may require that prior to any application, a contractor must submit to the Zoning Administrator:

   a. Identification of all properties where land application will occur, listed by Appomattox County Tax Map Identification Number;

   b. Schedule of dates for land application. The contractor may initially provide a range of dates for potential application, but it is the contractor's responsibility to update and maintain the schedule as dates are confirmed for current and subsequent land applications;

   c. Name and address of the property owner, and, where applicable, the lessee.

It is FURTHER ORDERED that this injunction shall remain in effect during the pendency of this case or until further order of this Court.

The Clerk of the Court is directed to send a certified copy of this Order to all counsel of record.